IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 1, 2016 Session

**STATE OF TENNESSEE v. SEDRICK CLAYTON**

**Appeal from the Criminal Court for Shelby County**
**No. 1203160    Carolyn W. Blackett, Judge**

———————————————

**No. W2015-00158-CCA-R3-DD  -  Filed August 18, 2016**

———————————————

The Defendant, Sedrick Clayton, was convicted by a Shelby County Criminal Court jury of three counts of first degree murder, attempt to commit first degree murder, possession of a firearm with the intent to go armed during the commission of a dangerous felony, employing a firearm during the commission or attempt to commit a dangerous felony, and unauthorized use of a motor vehicle. *See* T.C.A. §§ 39-12-101 (2014), 39-13-202(a)(1) (2014), 39-14-106, 39-17-1324(a) (2010) (amended 2012). The jury sentenced the Defendant to death for each first degree premeditated murder conviction. The trial court sentenced the Defendant to fifteen years for attempted first degree murder, three years for possession of a firearm with the intent to go armed during the commission of a dangerous felony, six years for employing a firearm during the commission of or attempt to commit a dangerous felony, and eleven months, twenty-nine days for unauthorized use of a motor vehicle. On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions for first degree premeditated murder and attempted first degree murder; (2) the trial court erred in denying the Defendant's motion to suppress his statements to the police; (3) double jeopardy principles prohibit his dual convictions for possessing a firearm with the intent to go armed during the commission of a dangerous felony and employing a firearm during the commission or attempt to commit a dangerous felony; (4) the trial court erred in admitting photographs of the victims during the penalty phase; (5) the trial court erred in admitting recordings of two 9-1-1 calls made from the victims' residence around the time of the murders; (6) Lieutenant Goods' testimony during redirect examination was improper in numerous respects; (7) Tennessee's death penalty scheme constitutes cruel and unusual punishment; (8) Tennessee's death penalty scheme is unconstitutional in numerous other respects; and (9) the Defendants sentences of death are disproportionate. Although we affirm the Defendant's convictions and sentences for each first degree premeditated murder and attempted first degree murder, we conclude that the trial court should have merged the convictions for possession of a firearm with the intent to go armed during the commission of a dangerous felony with the employing a firearm during the commission or attempt to

commit a dangerous felony. Therefore, we remand for the entry of corrected judgments. We affirm the judgments of the trial court in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed in Part; Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Steven C. Bush, District Public Defender; Tony N. Brayton and Harry Sayle III, Assistant Public Defenders (on appeal); and Gerald Skahan, Kindle Nance, and Anna Benson, Assistant Public Defenders (at trial), for the Appellant, Sedrick Clayton.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; John Bledsoe, Senior Counsel; Amy P. Weirich, District Attorney General; and Jennifer Nichols and Karen Cook, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

The evidence presented at trial established that on January 19, 2012, the Defendant shot and killed his girlfriend, Pashea Fisher, and Pashea's[1] parents, Arithio and Patricia Fisher, at the victims' home. The Defendant also attempted to kill Pashea's brother, A'Reco Fisher. The Defendant then fled the scene in Pashea's vehicle with his and Pashea's four-year-old daughter, J.C.[2]

### Guilt Phase

Stacey Polk, Patricia's niece, testified that Arithio, Patricia, Pashea, A'Reco, and J.C. lived in the same house. Pashea was twenty-three or twenty-four years old at the time of her death and was older than A'Reco. Arithio and Patricia's oldest son, Antonio, lived elsewhere. Ms. Polk stated that the Defendant did not live in the home but visited often. Ms. Polk recalled that she last saw the victims four days before their deaths on Thursday, January 19. She last spoke to Patricia on the telephone the night before her death.

---

[1] Because the victims shared the same last name, we refer to the victims by their first names. We mean no disrespect.

[2] It is the policy of this court to refer to minors by their initials.

Memphis Police Dispatcher Katie Montgomery testified that on Thursday, January 19, 2012, at 5:40 a.m., she received a 9-1-1 call that "broke" her. The call came from a landline and was an "open line call" in which someone dialed 9-1-1 but did not speak. Ms. Montgomery heard a man and a woman screaming in the background and a small child crying. She also heard "gurgling" but did not know what was occurring.

Ms. Montgomery stated that while she was listening to the call, another 9-1-1 call came in from a cell phone from the same address. Her coworker, Pam, answered the call and began speaking with a male. Ms. Montgomery heard two gunshots in the background of her call, after which she no longer heard the female "begging." The recording of each 9-1-1 call was played for the jury. Police officers, firefighters, and emergency medical technicians were dispatched to the scene.

Memphis Police Officer Chase Merritt testified that he was dispatched to the scene on January 19, 2012, at 5:42 a.m., and that he was the first officer to arrive. Officer Merritt stepped onto the front porch and saw the interior wooden front door was open. While looking through the glass on the exterior front door, Officer Merritt saw a young, African-American female, later identified as Pashea, lying on the floor and not moving. When he saw other patrol cars coming down the street, he opened the front door and announced his presence. Officer Merritt said he observed blood on the female's clothing and what he thought was a gunshot wound to her temple. He also saw a magazine for a firearm near her body. He had to step over her body to enter the house.

Officer Merritt testified that after announcing his presence, someone called out from the rear of the house. An African-American male, later identified as A'Reco, walked down the hallway toward the officers. Officer Merritt said officers instructed A'Reco to lie down, and he complied. Officer Merritt stated that the officers determined A'Reco was not a perpetrator within "a matter of seconds." Officer Merritt escorted A'Reco to a squad car while other officers cleared the rest of the house.

Officer Merritt testified that A'Reco was very quiet and could not believe what was happening. A'Reco told Officer Merritt that he was sleeping on the couch in the living room when he awoke to Pashea and the Defendant's arguing. A'Reco said that Pashea walked down the hallway into their parents' bedroom, closed the door, and locked it. The Defendant kicked open the door. A'Reco heard gunshots and Pashea yelling, "Stop, stop." He saw the Defendant grab Pashea and drag her down the hallway toward the front door as Pashea attempted to "fight off" the Defendant. A'Reco told Officer Merritt that the Defendant shot Pashea in the head with a black pistol and ran out of the house. A'Reco heard what sounded like Pashea's vehicle starting and called the police. Officer Merritt stated that he learned a white car parked near the home when he had arrived belonged to the Defendant.

- 3 -

Officer Merritt testified that A'Reco told him that the Defendant took J.C. with him. A'Reco never told Officer Merritt that he saw his parents fighting with anyone outside the bedroom. He said he did not see his parents before he heard gunshots. Officer Merritt stated that a male and a female, later identified as Arithio and Patricia, were found in the back bedroom. One of them was dead at the scene, and the other was transported to a hospital.

Officer Merritt testified that according to his supplemental report, A'Reco said he awoke to arguing and gunshots, saw Pashea and the Defendant arguing in the living room, and saw Pashea go down the hallway to get away from the Defendant. Officer Merritt stated that A'Reco never said he heard his father arguing with anyone.

Memphis Police Officer Matthew Biggs testified that he and his partner, Officer Michael Tran, responded to the scene of the shooting. When they arrived, they saw Officer Merritt on the front porch. Officer Biggs said he observed Pashea lying on the floor and had to step over her body to enter the living room. By that time, Officer Merritt had A'Reco detained on the living room floor.

Officer Biggs testified that he met Officer Tran at the entry of the bedroom and saw that someone had kicked in the door. He said the edge of the door was frayed where it had been latched to the door frame. Arithio was lying in front of the door and next to the bed, and a black telephone cord was lying across his body. Officer Biggs said a table in the bedroom was overturned. Officer Biggs heard no sounds of life coming from Arithio.

Officer Biggs testified that Patricia was lying on the floor at the other end of the bedroom and that she was making noises and "kind of moving, but she was having a hard time." Officer Biggs and his partner attempted to render aid, but she was unresponsive.

Officer Biggs testified that bullet holes and casings were inside the bedroom. He said there were holes in some of the pillows on the bed. He also said no firearms were found in the house. He stated that when he first entered the house, he saw a magazine for a pistol on the floor next to Pashea's body.

Officer Michael Tran, Officer Biggs's partner, provided testimony similar to Officer Biggs's testimony. Officer Tran said that when he initially entered the bedroom, he saw the two victims and left the room to find his partner. He recalled that while at the scene, they received a description of a white vehicle with large chrome rims that belonged to the shooter. The vehicle was parked in front of the house.

- 4 -

Theodore Novack, a firefighter and paramedic, testified that he responded to the scene in an ambulance. He said it was reported that someone was still alive in the back bedroom. He saw Pashea, who was approximately twenty years old, lying on the floor at the front door. She appeared to have a gunshot wound to her head and was deceased.

Mr. Novack testified that as he walked into the bedroom, he saw Arithio, who was approximately fifty years old, with multiple gunshot wounds to his chest. Mr. Novack saw blood on the bed and said Arithio was deceased on the floor next to the bed.

Mr. Novack stated that Patricia, who was in the bedroom, had agonal respirations and a weak pulse. He noted gunshot wounds to her chest and abdomen. Mr. Novack said Patricia was moaning, was unable to answer questions, and was transported by ambulance to the Regional Medical Center (the Med). While in route, she went into cardiac arrest, and paramedics began CPR and administered cardiac drugs. Patricia died from her wounds after arriving at the Med.

A'Reco Fisher testified that at the time of the trial, he was twenty-five years old and lived with various family members, including his niece, J.C. Patricia was an assistant manager at the Memphis Zoo; Arithio was employed by the Internal Revenue Service; and Pashea worked at the Shelby County Court Clerk's Office. In January 2012, A'Reco had completed high school and was a barber.

A'Reco testified that his parents' house had two bedrooms. His parents shared one bedroom, and A'Reco, Pashea, and J.C. shared the other bedroom, which had two beds. A'Reco said that if he did not sleep in his bedroom, he slept on the couch in the living room. He stated that he was sleeping on the couch on January 19, 2012. He said that the Defendant arrived at approximately 12:40 a.m. and walked directly into Pashea's bedroom.

A'Reco testified that he later awoke to gunshots. He did not see his parents and did not hear his father arguing with anyone. Rather, A'Reco heard the Defendant and Pashea's arguing and Pashea's crying. A'Reco stated that he had never seen the Defendant with a gun in the home before that morning and that he was unaware the Defendant owned a gun. A'Reco said no one in the home owned a gun.

A'Reco testified that he saw the Defendant "handling" Pashea in the hallway. The Defendant dragged Pashea down the hallway to the front of the house, told her that he was going to shoot her, and dragged her further while Pashea attempted to flee. A'Reco saw the Defendant shoot Pashea in the head and saw Pashea fall on the floor.

A'Reco testified that at one point, he saw Pashea run into their parents' bedroom and that the Defendant "bust down" the door while holding a gun. A'Reco lost sight of J.C. during the incident. Pashea yelled at A'Reco to call 9-1-1, and A'Reco did so while on the couch in the living room. The Defendant later left the house with J.C. in a black Escalade while his car remained parked in front of the house. A'Reco stated that J.C. did not want to go with the Defendant and that the Defendant had a handgun when he left the house. A'Reco said that after the Defendant left, he checked on his parents and Pashea. His father and Pashea were unconscious, and his mother was "fighting for her life."

On cross-examination, A'Reco acknowledged that he had a prior conviction for filing a false report. He testified that he had never heard the Defendant and Pashea argue before that night. A'Reco said Pashea attempted to calm the Defendant, who was agitated and excited. A'Reco said that the Defendant had "become an animal" and that he had never seen the Defendant act that way previously. A'Reco stated that the Defendant never threatened him or pointed a gun at him or J.C. A'Reco also stated that he never slept in the recliner in the living room.

On redirect examination, A'Reco testified that he was aware of a bullet hole found in the arm of the couch and in the pillow where his head had been. A'Reco said the hole did not occur while he was awake. He also said that after he awoke, the Defendant did not point the gun at him.

Memphis Police Sergeant Richard Borden testified that by the time he arrived at the scene, the Defendant had been named as a suspect. At 7:15 a.m., Lillian Harvey, the Defendant's mother approached Sergeant Borden and said that she had spoken to the Defendant on his cell phone and that the Defendant stated that he wanted to surrender to the police.

Sergeant Borden testified that Ms. Harvey called the Defendant and gave the phone to Sergeant Borden. Sergeant Borden stated that he identified himself to the Defendant and asked about J.C. The Defendant stated that J.C. was "fine." Sergeant Borden said that the Defendant was agitated and that the Defendant said he needed time to calm down. The Defendant asked Sergeant Borden to call him back in twenty minutes. When Sergeant Borden called the Defendant again, the Defendant said he was sitting in his car, needed more time, and would call Sergeant Borden. At 7:50 a.m., Sergeant Borden called the Defendant, but the call went to voicemail.

Sergeant Borden testified that at 8:12 a.m., he called the Defendant, who answered and confirmed J.C. was still "fine." The Defendant said that he wanted to surrender to the police and that he was traveling to a precinct. Sergeant Borden stated that he became concerned when the Defendant would not identify the precinct and that the Defendant

then ended the call. Sergeant Borden called the dispatcher and instructed her to advise all precincts that a homicide suspect with a four-year-old girl was en route to surrender to the police.

Sergeant Borden testified that he called the Defendant at 8:34 a.m. The Defendant said he still had the gun and asked Sergeant Borden what he should do with it. Sergeant Borden instructed him to place the gun on the floor of the vehicle. The Defendant stated that he was going to the Raines Station precinct, and Sergeant Borden's partner contacted the precinct and informed officers to expect the Defendant. The Defendant said a patrol car was behind his car and was going to stop him. Sergeant Borden instructed officers over the radio not to stop the Defendant. When the Defendant arrived at the precinct, Sergeant Borden instructed the Defendant to place his hands on the steering wheel. Sergeant Borden told the Defendant that the Defendant should not touch the gun, and the Defendant stated that he had placed the gun on the floor. The Defendant said he had to go because the officers had ordered him to hang up. Sergeant Borden said that at 8:47 a.m., officers from the Raines Station precinct reported over the radio that the Defendant was in custody and that J.C. was safe.

Sergeant Borden testified that he did not know the type of car in which the Defendant traveled or whether the Defendant was driving the car. Sergeant Borden said he heard another male voice during the last call. Sergeant Borden explained he did not ask who the man was because he did not want to upset the Defendant. Sergeant Borden said he only wanted to ensure that the Defendant went to the precinct and that J.C. was safe. Sergeant Borden never went to the Raines Station precinct and never saw the Defendant. On cross-examination, Sergeant Borden testified that the Defendant was "mostly cooperative" and "cordial."

Memphis Police Officer Dale Jones testified that he was a member of the Raines Station Task Force in January 2012. On January 19, 2012, he learned from his lieutenant that a murder suspect could be coming to the area. Officer Jones was instructed to watch for a tan or brown Maxima in the area and to follow the car. After Officer Jones saw the car, he, an unmarked car, and two squad cars followed the Maxima to the Raines Station precinct. Officer Jones said that the car's driver, the Defendant, J.C., another girl around J.C.'s age, and the other girl's mother were inside the Maxima.

Officer Jones testified that he found a Smith & Wesson .40-caliber firearm on the rear passenger-side floorboard. Officer Jones stated that the gun's safety was not engaged, that the magazine was in the firearm, and that a bullet was in the chamber.

Memphis Police Sergeant Alpha Hinds testified that he went to Southaven, Mississippi, to secure a black Escalade belonging to one of the victims. Sergeant Hinds

said a crime scene officer and Adrienne Lewis, the mother of the Defendant's other daughter, accompanied him. Sergeant Hinds said Ms. Lewis knew the vehicle's location. The vehicle was found in an industrial area near Ms. Lewis's place of employment. The vehicle was towed to the Memphis crime scene office.

Memphis Police Lieutenant Anthony Mullins testified that he was responsible for assessing and documenting the crime scene and for directing crime scene investigators relative to which items needed to be photographed and collected. Lieutenant Mullins said a search warrant was obtained to allow officers to enter and process the scene. He saw Pashea lying on the floor just inside the entryway.

Lieutenant Mullins testified that evidence was located in every room of the house except the bathroom. He said the majority of the evidence was found in the dining room, the front room, the master bedroom, and the interior hallway. Two fired cartridge casings were found on the kitchen floor. One fired cartridge casing was on the floor of the second bedroom by the doorway leading into the kitchen. Lieutenant Mullins noted debris on the floor throughout the hallway, including papers, cologne or perfume, and nail clippers. He said it appeared as though items had been knocked off a bookcase in the hallway. Two fired cartridge casings, an unfired cartridge, and blood were found in the hallway.

Lieutenant Mullins testified that a box that had held a ceramic or floor heater was overturned in the hallway. He observed a transfer blood stain on top of the heater box. He explained that a transfer blood stain occurs when a bloody object touches an object that is not bloody, leaving a transfer, such as the transfer of blood from a person to an object. Blood stains also dripped down the heater box. Lieutenant Mullins stated that it appeared as though someone who was bleeding hit the heater box and knocked it over. The person was dripping blood, and the blood dripped down the heater box. Blood drops were also on the hallway floor.

Lieutenant Mullins testified that the doorframe to the master bedroom was damaged and that its latch plate was lying on the hallway floor, was "deformed, a little twisted," and appeared to have been shot. He noted damage around the door latch and said it appeared that a bullet was fired through the doorframe. Discoloration on the door appeared to be soot and powder from a gunshot fired at close range.

Lieutenant Mullins testified that when he entered the master bedroom, he saw Arithio lying on the floor just inside the door. An end table was overturned and partially on top of Arithio. Clothing and papers were on the floor, and blood was on the bedding. Lieutenant Mullins saw what appeared to be a gunshot entry point though the bedroom door and damage to the closet door and walls. A fired bullet and multiple fired cartridge

casings were found on the bedroom floor.  Lieutenant Mullins stated that no firearms were found around Arithio's body.  Splinters of wood that appeared to have come from the door were recovered near the door.

Lieutenant Mullins testified that by using a trajectory rod, he determined that a bullet traveled through the door of the master bedroom, striking the closet door and the door frame.  The projectile was recovered from the frame of the closet door.  Bullet holes were found in the pillows on the bed.  Lieutenant Mullins noted three defects in the wall furthest from the door, indicating that the wall had been struck by bullets.  A bullet also went through shoe boxes on the floor and into the wall.

Lieutenant Mullins testified that a Chevrolet Camaro parked in the backyard garage appeared to have bullet damage.  The bullet entered the wall, exited the house, struck the car, and deflected.  The bullet was never recovered.

Lieutenant Mullins testified that Patricia had been transported to the Med before he arrived at the scene.  The officer at the scene showed Lieutenant Mullins where Patricia was found, and Lieutenant Mullins observed blood stains in the general area.

Lieutenant Mullins testified that he believed the shooting began closer to the bedroom area in the hallway and ended in the living room.  A fired cartridge casing and a cell phone were found on the carpet behind the love seat in the living room.  A small piece of a copper jacket was found on the arm of the love seat.  Lieutenant Mullins identified defects in the arm and pillow of the couch.  A trajectory rod was placed through the arm of the sofa, through a pillow, and into the seat cushion.  Two fired cartridge casings, an unfired cartridge, and a bullet fragment were collected from the living room area.  A fired cartridge casing was recovered from the couch.

Lieutenant Mullins testified that a magazine for a firearm containing unfired cartridges was recovered next to Pashea's body.  Pashea had a gunshot wound to her leg.  Lieutenant Mullins noted a piece of splintered wood on Pashea's pants leg, which he said was consistent with the splinters of wood from the door found in the master bedroom.

Lieutenant Mullins testified that a stain, which appeared to be blood, found on the exterior portion of the front door appeared to be a transfer stain but that it was difficult to determine because the door was black.  He stated that blood was on a pair of jeans collected from the Defendant.  Lieutenant Mullins knew Pashea's black 2004 Escalade was taken from the scene.  He said the value of the vehicle was probably more than $10,000.

On cross-examination, Lieutenant Mullins testified that portions of the house were not well lit and that officers opened the front door to allow more light to enter the house. He acknowledged that based upon the items overturned and the blood in the hallway, a struggle or fight appeared to have occurred.

Dr. Miguel Laboy, an expert in forensic pathology, testified that he performed Patricia's autopsy. He noted evidence of medical intervention on Patricia's body, including various tubes and catheters. Dr. Laboy stated that Patricia sustained a gunshot wound to the left side. The bullet perforated the soft tissue, fractured the medial posterior aspect of the left pelvis, and exited through the right buttock. Dr. Laboy said that this gunshot wound was not fatal and that most people would survive such an injury.

Dr. Laboy testified that Patricia sustained a superficial gunshot wound to the abdomen. He explained that the bullet perforated the skin and exited close to the shoulder. Dr. Laboy identified another gunshot wound that was located below the above-described wound. The bullet perforated the soft tissue, entered the side, and exited at the right buttock.

Dr. Laboy testified that Patricia had an entry gunshot wound on the upper outside of her breast. The bullet perforated her breast and exited on the bottom part of her breast. The bullet reentered her chest and perforated the diaphragm, the transverse colon, the aorta, and the ilium bone. Dr. Laboy recovered the bullet in the pelvic area. He stated that the gunshot was lethal. Dr. Laboy concluded that the cause of Patricia's death was multiple gunshot wounds to the torso and that the manner of death was homicide. The toxicology results were negative for drugs and alcohol.

Dr. Karen Chancellor, an expert in clinical, anatomic, and forensic pathology testified that she performed Arithio's and Pashea's autopsies. Dr. Chancellor stated that Arithio was approximately fifty-six years old, was 5′6″, and weighed 128 pounds. Arithio received a gunshot wound to the right side of his neck, which corresponded with an exit wound on the left side of his back. He had abrasions on his upper right arm and two superficial abrasions on his lower abdomen. He also had a large, irregular-shaped abrasion on the right side of his chest. Dr. Chancellor said that within the abrasion was a "horizontally-oriented" abrasion, which was likely a grazing gunshot wound. A corresponding defect was on Arithio's shirt. Dr. Chancellor stated that any of the abrasions could have been grazing gunshot wounds. She concluded that the gunshot wound to Arithio's neck was fatal and was the cause of death and that the manner of death was homicide. Arithio's toxicology results were negative for drugs and alcohol.

Dr. Chancellor testified that Pashea was twenty-three years old, was 5′4″, and weighed 134 pounds. Pashea suffered a gunshot wound to the left side of her head,

which exited the back of her head. Small particles consistent with bullet fragments were recovered from Pashea's head. Dr. Chancellor observed powder stippling surrounding the entry wound and concluded the end of the gun's barrel was between five or six inches and three feet from Pashea when the gun was fired. Dr. Chancellor explained that a more accurate estimate would require testing of the gun and the ammunition.

Dr. Chancellor testified that Pashea had two gunshot entry wounds on her right leg and two exit wounds on the back of her right leg. Dr. Chancellor observed four holes in Pashea's pants that corresponded to the entry and exit wounds. She stated that there were no fractures or vital injuries associated with those wounds and that the wounds were not fatal. She also stated that if Pashea had only received the gunshot wounds to her leg, Pashea would have been capable of walking.

Dr. Chancellor testified that the shot to Pashea's head rendered her unconscious and that Dr. Chancellor did not expect Pashea would have lived long after sustaining the head injury, absent medical attention. Dr. Chancellor stated that the cause of Pashea's death was the gunshot wound to her head and that the manner of death was homicide. The toxicology results were negative for drugs and alcohol.

On cross-examination, Dr. Chancellor testified that she was unable to determine the positions of the victims when they were shot. She acknowledged that Arithio could have been shot during a struggle but said she did not see any injuries indicative of a struggle. She acknowledged that it was possible to receive abrasions during an altercation.

Dr. Chancellor testified that the entry wound on Arithio's neck was five-sixteenths of an inch in diameter, which was consistent with the size of a bullet. She explained that the size of a wound was not always indicative of the size of a bullet because skin could stretch and was "deformable." She found no evidence of the bullet "tumbling" or "yawing" and said the nose of the bullet likely entered Arithio's neck. She explained that a bullet tumbles when it travels "end over end" as the result of a defective gun or a bullet first striking another object.

On redirect examination, Dr. Chancellor testified that she would not have been surprised if the same gun was used to kill Arithio and Pashea. Based upon her years of experience, she noted a variance existed in the measurement of gunshot entry wounds. She stated that any number of body positions was consistent with Arithio's gunshot wound, including bending over, being in bed, or reaching for a telephone.

Tennessee Bureau of Investigation (TBI) Special Agent Cervinia Braswell, an expert in firearms identification, testified that she examined a Smith & Wesson .40-

caliber pistol in operating condition and two magazines that held up to fourteen bullets or cartridges. She said the magazines fit and functioned in the .40-caliber pistol.

Agent Braswell testified that she examined twelve fired cartridge casings and nine intact bullets or bullet fragments. She determined that the cartridge casings, intact bullets, and fragments were all fired from the .40-caliber pistol. She also examined two jacket fragments and a lead fragment, none of which had markings for comparison. Finally, she examined two granular particles submitted by the Medical Examiner's Office and determined the particles were consistent with gunpowder or stippling.

On cross-examination, Agent Braswell testified that one of the magazines contained five live rounds and that the other magazine contained six live rounds. She said that firing six bullets from a magazine would be a very quick process and that ejecting and reloading a magazine could also be a quick process. She said that the gun ejected cartridge casings more than eleven and one-half feet to the right as the gun was fired but that this distance would be altered if the casings struck a surface.

Agent Braswell testified that tumbling would occur if someone shot at a door and the bullet traveled through the door and hit a person. She explained that the shape of a person's entry wound would depend upon the stage of the tumble when the bullet hit the person. She explained that if a bullet hit a door, the bullet could become deformed or change shape. She said it was impossible to determine the shape of a bullet after it hit an intervening object.

On redirect examination, Agent Braswell testified that in addition to the fourteen rounds contained in the magazine, one round could have been in the gun's chamber, for a total of fifteen rounds. She said that if someone fired the gun in a narrow hallway, the cartridge casings could have bounced off walls and surfaces. She acknowledged on recross-examination that the fired cartridge casings found at the scene could have been kicked around the house.

The parties stipulated that Pashea's blood was on the Defendant's jeans, the front door, the heater box in the living room, on the floor in the hallway, and near where her body was found. The parties also stipulated that Arithio's blood was found in the master bedroom, near where his body was found, and on the bed sheets. Likewise, the parties stipulated that Patricia's blood was found on the floor in the master bedroom and on the bed sheets.

Memphis Police Lieutenant Darren Goods testified that after the Defendant surrendered to the police, Sergeant Vivian Murray, the case coordinator, asked Lieutenant Goods to assist with the Defendant's interview. Lieutenant Goods stated that he first saw

the Defendant sitting in a large interview room at the police department. The Defendant's hands were not handcuffed, but his leg was shackled to a bench. At approximately 11:30 a.m., Lieutenant Goods offered the Defendant water and escorted the Defendant to the restroom without questioning him.

Lieutenant Goods testified that he wanted the crime scene investigation completed before interviewing the Defendant. Lieutenant Goods explained that waiting until evidence was gathered before interviewing a suspect allowed the officer to determine whether a suspect was being honest. The officers listened to the recordings of the 9-1-1 calls after Sergeant Murray briefed the officers. A'Reco gave a formal statement, and witnesses who were involved in the Defendant's surrender were interviewed.

Lieutenant Goods said that while the Defendant was in the interview room, the Defendant was allowed to use the restroom, was provided lunch, and was offered water. The interview began at 4:25 p.m. Lieutenant Goods was the primary officer who interviewed the Defendant, and his partner took notes. Upon entering the interview room, the two officers introduced themselves, obtained the Defendant's identifying information, attempted to build a rapport with him, and advised the Defendant of his *Miranda* rights.

Lieutenant Goods testified that while he and his partner were gathering personal information and explaining why they were there, the Defendant said, "[M]an, I'm sorry. You don't even have to say it; I did it." The Defendant then whispered, "I did it." Lieutenant Goods stated that because the Defendant had not yet been advised of his rights, he stopped the Defendant and told him, "This is your opportunity to tell your side of the story. We want the truth. That's why we're here. You don't need to beat around the bush." Lieutenant Goods also told the Defendant, "[Y]ou're going to go to jail. If I killed my family, I would certainly expect to go to jail as well." Lieutenant Goods then advised the Defendant of his *Miranda* rights.

Lieutenant Goods testified that he read the Advice of Rights form to the Defendant and that the Defendant read the form aloud. Lieutenant Goods explained that he wanted to ensure the Defendant could read, comprehend what he was reading, and make an intelligent waiver of his rights. The Defendant signed the Advice of Rights form at 4:32 p.m. The form indicated that the Defendant was age twenty-eight and had completed the ninth grade. Lieutenant Goods said the Defendant reported that he had smoked marijuana at approximately 9:00 p.m. "the night before last night." The Defendant reported no prescription drug use or mental health disorders. Lieutenant Goods stated that the Defendant was responsive and had no difficulty answering questions. As the Defendant was writing the date on the Advice of Rights form, he said that it was Arithio's birthday.

- 13 -

Lieutenant Goods testified that the Defendant said that at approximately 12:30 a.m. the morning of the shooting, he and Pashea were engaged in sexual intercourse when he smelled an odor that led him to believe Pashea had sexual intercourse with someone else earlier that day. The Defendant stated that they argued about his suspicions and that Pashea mentioned someone named "Jason." Over the next few hours, they made up and had sexual intercourse. The Defendant told the officers that later he got out of bed and acted as though he was leaving "for good" and that Pashea asked him not to leave. He stated that he and Pashea continued talking and that Pashea continued telling him not to leave her. He said that he heard an alarm at approximately 4:30 or 4:45 a.m. and that he knew Arithio normally woke up around that time to drive Pashea to work. The Defendant saw a light in Arithio and Patricia's bedroom. The Defendant stated that he and Pashea were in the hallway and that Pashea pulled on him and told him not to go. He said they were "tussling back and forth" but denied fighting.

Lieutenant Goods testified that the Defendant told the officers that he suddenly saw a bright light and that he, Pashea, and Arithio ended up on the floor. The Defendant dropped his gun, keys, cell phone, and scales. He said he picked up his gun and began "kind of indiscriminately shooting." He maintained that he continued shooting his gun because he was afraid. He stated that at some point, Arithio returned to his bedroom and that the Defendant shot his gun until it was empty. The Defendant said that he attempted to leave but that Pashea pulled on his jacket and told him not to go. Pashea said she would retrieve her shoes and J.C. and go with him. The Defendant stated that he made his way through the house shooting. He also stated that he knew A'Reco slept on the couch in the living room and shot in the direction where he believed A'Reco would have been sleeping. The Defendant said that although he could not see anything because the house was dark, he shot downward in the direction he believed A'Reco was located.

The Defendant told the officers that at some point, Pashea pulled on the gun and that the gun fired. He heard J.C. calling for him, retrieved her, and left the house. He said he contacted a woman named "Adrienne" and met her before surrendering to the police. He told the officers that after the shooting, he returned to retrieve his scales, keys, and clip, all of which he had dropped. He said he left in Pashea's vehicle but gave no explanation as to why he took her vehicle.

Lieutenant Goods testified that in the Defendant's initial version of the events, the Defendant did not state what caused him to start shooting after he fell. The Defendant did not indicate that he had shot any of the victims at that point but only said he had shot at Arithio. Lieutenant Goods said that after he confronted the Defendant, the Defendant included additional details. The Defendant denied shooting through or kicking down the bedroom door. After the officers confronted the Defendant with evidence of bullet holes in the door and door frame, the Defendant said that he hit the door with his shoulder and

that it opened.  Lieutenant Goods stated that the Defendant "tried to kind of quantify that and said that the door was kind of torn up, was tearing up."

Lieutenant Goods testified that in the Defendant's second version of the events, the Defendant said that after seeing the bright light, Arithio kicked him in the chest, causing the Defendant, Pashea, and Arithio to fall.  Lieutenant Goods was unaware that Arithio weighed 128 pounds but said he saw Arithio and knew he was not a large man.  Lieutenant Goods said that he told the Defendant that the Defendant was not being completely honest and that the recordings of the 9-1-1 calls indicated that additional events occurred.  The Defendant said that Pashea begged him not to kill her parents but that he had already shot them.  The Defendant stated that he wanted to get inside the bedroom because he heard Pashea tell someone over the telephone he had shot her family.

Lieutenant Goods testified that the Defendant stated during his second or third version of the events that the Defendant had a Smith & Wesson .40-caliber semi-automatic handgun with a fourteen-round magazine and one round in the chamber.  The Defendant said he fired the weapon until it either jammed or was empty.  He then reloaded it with another full fourteen-round magazine and continued shooting.  The Defendant told Lieutenant Goods that while Pashea was holding on to him, he noticed blood on her pants leg.  He said that as he attempted to leave, Pashea tugged on him, that he shot into the area where A'Reco was located, that Pashea grabbed his gun, that the gun fired, and that Pashea was shot.  He stated that he and A'Reco sold drugs out of the home and that the Fishers were aware of their activities.  The Defendant also stated that although he did not see A'Reco with a gun that morning, he knew that guns were in the house and that A'Reco normally possessed a gun.  The Defendant said he knew A'Reco was asleep on the couch.

Lieutenant Goods testified that he told the Defendant that J.C. witnessed the shooting.  Lieutenant Goods stated the Defendant responded that J.C. "doesn't tell the truth."  Lieutenant Goods said the Defendant never admitted firing into the bedroom door but admitted forcing it open with his shoulder.  Lieutenant Goods said the Defendant placed himself inside the bedroom while shooting the gun.  The Defendant said that Patricia was shot as she crawled over the bed and that she fell between the bed and an armoire.

Lieutenant Goods testified that during the interview, he played a recording of one of the 9-1-1 calls, hoping to encourage the Defendant to tell the "absolute truth."  Lieutenant Goods said that in the recording, Pashea was heard screaming, "Please don't kill my parents, please don't kill my parents."  Lieutenant Goods recalled that he also heard Pashea's mentioning J.C. and the Defendant's saying "something to the effect [of]

- 15 -

let me go or I'm going to shoot her," which was followed by a gunshot. Lieutenant Goods said that the Defendant's response to hearing the recording was that Pashea was "playing a game" when she was begging him not to kill her parents because they had already been shot. Lieutenant Goods stated that he became angry, raised his voice, and said "[s]omething to the effect of [either you are] full of s--- or you've lost you f------ mind." The Defendant did not respond.

Lieutenant Goods testified that the Defendant gave a written statement which reflected that the Defendant was advised of his rights, that he understood his rights, and that he wished to make a statement. The Defendant read the statement and made numerous corrections.

Lieutenant Goods read the Defendant's corrected statement to the jury. In the statement, the Defendant acknowledged that he was responsible for the victims' deaths. He said he shot them with a .40-caliber "automatic" handgun. When asked to explain what occurred before, during, and after the incident, the Defendant said in his statement:

> It started with sex. Me and Pashea got into an argument and I ended up putting all my stuff in my pocket, my clip and my scale, and she felt like I was fixing to leave for good. This was around 12:30 a.m.
>
> We made up around 4:30 a.m. and got up and she was getting ready to work. It led to her wanting me to take her to work. That led to the bathroom where it really wasn't an argument. It was, "don't leave right now. Holding me and tussling and saying don't leave."
>
> 'Til us coming out the bathroom seeming like we were apparently to the father where he opened the room door. Arithio Fisher kicked me into the stand where they keep their cologne. Me, Pashea and Arithio hit the ground and I grabbed my gun. It fell out.

The Defendant later changed the last sentence to read, "It fell out after." In the written statement, the Defendant said, "I started shooting and at the same time I'm being snatched by Pashea off in Arithio's room towards the closet, but I'm turn [sic] towards the fan. And as he dive [sic] towards the bed, I kept shooting in the room. I really never aimed." Upon reviewing his statement, the Defendant wrote in "where I was on the ground and while I was getting up" after "I started shooting." He also included language to state that he turned toward the fan and the bed. The Defendant continued in his written statement, "Basically everything that moved, everything that I got a glimpse of I just kept shooting and I ran towards the front door when my gun stopped shooting." He later

- 16 -

crossed out "everything that I got a glimpse of" and replaced it with "scared me at the time."

In his written statement, the Defendant said that when he reached the front door, he realized that he did not have his keys. He said he picked up his "second clip off the floor" and later wrote in "when I got back to the room." He did not recall loading the second clip into the gun and breaking down the door. He said that when he reentered the "room" to retrieve his keys, he told Pashea to "come on." He said she told him that she was going to get J.C. and her shoes and that she was "holding [him] towards the door." The Defendant later drew a line through "towards the door" and inserted "pulled me back in the door."

The Defendant stated that he "fired two or three more times in the living room in the dark." He later added "trying to get out of the house." He said he had one hand blocking his face in case any shots were fired back at him. He then fired two or three shots and yelled, "I'm sorry," to A'Reco. The Defendant stated that when he was at the front door, Pashea held his sleeve and told him not to leave yet. He said he "just snatched away and shot her . . . three or four more times and ran towards the truck." The Defendant later wrote in "to scare her." He said he heard "Daddy, don't leave me," but later drew a line through this statement. The Defendant said he heard "daddy get me" and saw J.C. standing on the porch. He took J.C. and left.

In his written statement, the Defendant stated that he called Adrienne Lewis, told her that he needed her help and asked her to hide something for him. He met her near her place of employment. He said that he got into Ms. Lewis's car and that they went to an apartment in downtown Memphis where one of Ms. Lewis's friends lived. They remained at the apartment for approximately forty-five minutes while the Defendant called and spoke to members of his family. He said they went to the home of his brother-in-law, Jesse Clements. The Defendant stated that he, Mr. Clements, J.C., Ms. Lewis, and the Defendant's other daughter, Y.C., waited at the apartment for other members of the Defendant's family to arrive. The Defendant said that they decided not to wait and instead went to the Raines Station precinct, where he surrendered to the police.

The Defendant stated that he was unsure whether Arithio was shot first. He also stated that he did not recall when he first shot Pashea but recalled seeing her bloody leg. In reviewing his statement, the Defendant inserted language to state that he also did not recall shooting "the mama." He said he always carried his gun.

When asked why the Defendant believed it was necessary to start shooting, he replied in his written statement, "I panicked when he kicked me to the floor . . . and my gun fell out." After reviewing the statement, the Defendant wrote "and felt afraid" to the

end of the sentence.  The Defendant continued, "I saw my gun on the floor and the first thing I did was grab it and I snapped."  The Defendant later crossed through "the first thing I did was grab it and I snapped" and wrote "I grabbed it before they did."  He maintained he was in fear of his life.

The Defendant said he was unsure whether Arithio was armed when he was shot.  When asked how he could have been in fear of his life if he was unsure whether Arithio was armed, the Defendant replied, "Because as we [were] tussling, out of nowhere I am kicked to the floor and everything right there.  My gun flew out on the floor.  He could have grabbed my gun."  Defendant said Arithio did not grab the gun because the Defendant picked up the gun as soon as he saw it.  The Defendant was unsure whether Patricia was armed with a gun or other deadly weapon before he shot her.  He maintained that he did not recall shooting Pashea.  He also maintained that it was a mistake to shoot and kill Arithio, Patricia, and Pashea and that he "didn't mean to hurt nobody."  When the Defendant reviewed the typewritten statement, he wrote that Arithio "scared me when he kicked me down."

The Defendant stated that his gun held fourteen rounds plus one round in the chamber and that he had two magazines.  He was unsure of the number of rounds fired.  When asked about the number of times he shot Arithio, the Defendant replied, "I'm not sure.  I was just shooting.  I don't know where I hit him or when I hit him.  The more he moved, the more I panicked, the more he moved, the more scared I was."  The Defendant later changed "was" to "got."  He was unsure how close he was to Arithio when he shot Arithio because the Defendant and Pashea were involved in a "tussle" while he was shooting.  The Defendant said Arithio was within an arm's length when the Defendant shot him.  The Defendant denied placing the barrel of the gun against any part of Arithio's body when he fired the shots.

The Defendant maintained that he did not see Patricia and said, "I was just firing and shooting and she got hit by mistake."  Upon reviewing his statement, the Defendant later added "I felt like they all was finna get me."  Lieutenant Goods questioned the Defendant regarding his statement during the initial interview that he was shooting at everything that came toward him and that he had seen Patricia in the bed before shooting her.  The Defendant denied making the statement and maintained that he was firing toward Arithio, who was in bed.  The Defendant, however, acknowledged that he was shooting at everything that came at him.  While he recalled seeing Patricia fall, he maintained he did not think he shot her but he believed Patricia was attempting to get out of the way.  He said he was in "panic mode" and later added that he was scared.

The Defendant did not know how many rounds were in his gun when the police seized it.  He said that he had a handgun permit and that he was taught if two or more

- 18 -

people are within an arm's length and you are in fear of your life, "you shoot until you drop." He acknowledged that he was taught to use deadly force only in self-defense or in the defense of the life of an innocent third party.

The Defendant stated that he was "positive" that his gun was not the only gun in the house and that A'Reco and Arithio each owned a gun. The Defendant said that he believed Arithio was running to retrieve a gun and that the Defendant "kept firing to stop him from hurting me." After reviewing his written statement, the Defendant inserted, "I was scared." He was unsure whether he ever saw any of the victims with a gun and said that "it was in the heat of the moment and I panicked." The Defendant was unsure whether he used deadly force on an unarmed person. He explained that Arithio's gun "could have been right there. I guess I was keeping him from it. All I know, he had it in his hand." The Defendant later modified the sentence to state, "All I know, he could have had it in his hand." He denied shooting Arithio to prevent Arithio from retrieving a gun. He explained he shot Arithio in a "panic to keep him from doing anything else" to him. After reviewing the written statement, the Defendant inserted language explaining that he was "scared" and "outnumbered."

The Defendant told the officers that when he returned for his keys, he picked up his second magazine off the floor and reloaded his gun. He stated that while shooting his gun, his noticed that Pashea had gone into her parents' bedroom. He was unsure when she had entered the bedroom and maintained that Pashea pulled him into the bedroom. Lieutenant Goods said this statement was the first time the Defendant claimed Pashea had pulled him into the bedroom.

The Defendant stated that after shooting Arithio and Patricia, he returned to the master bedroom to retrieve the keys to Pashea's vehicle. Pashea tried to shut the bedroom door and prevent him from entering. According to the Defendant, he broke down the door to the bedroom because he was "in [a] panic to get the keys." He did not recall shooting through the door. The keys were on an end table next to the bed. The Defendant stated that when he grabbed the keys and began walking toward the door, Pashea told him to wait for her to retrieve her shoes and J.C. He said he thought that Pashea initially had tried to keep him away from the bedroom because she believed he was planning to injure her. He also said that Pashea told him not to kill her parents but that he had shot her parents already. He stated that he did not notice Pashea had been shot in the leg until he returned to the master bedroom for the keys. He also stated that when he last saw J.C., she was in the bed in Pashea's bedroom.

The Defendant stated that after he retrieved the keys, he heard A'Reco yelling, "what the f---," so the Defendant ran toward the front door while shooting his gun. After reviewing his statement, the Defendant added "but I was not aiming at no one."

- 19 -

According to the Defendant, A'Reco usually slept in the recliner in front of the television. Lieutenant Goods testified that the Defendant earlier had stated that A'Reco usually slept on the couch. The Defendant maintained that A'Reco was asleep in the recliner when the shooting occurred. The Defendant denied shooting at A'Reco and said that if he did, it was not intentional. Upon reviewing his statement, the Defendant wrote, "I shot in the living room to scare him so I could get out."

When asked whether the Defendant wished to add anything else to aid in the investigation, he replied, "I apologize. It happened out of fear. I didn't mean to hurt nobody. I really didn't know what I did until the detectives let me know." After reviewing his statement, the Defendant added, "I'm sorry." After the written statement was completed, the Defendant corrected the statement to read that he shot the victims "out of fear."

Lieutenant Goods testified that after the Defendant signed the statement and while waiting on a transport car to take the Defendant to jail, Lieutenant Goods became angry with the Defendant due to his "cavalier" attitude regarding the shooting. Lieutenant Goods stated that the Defendant made a statement to the effect of "I don't know why you're raising your voice. It's not a big deal." Lieutenant Goods told the Defendant that "he must be out of his f------ mind."

On cross-examination, Lieutenant Goods testified that he first met with the Defendant at 11:43 a.m. and that the Defendant signed his statement at 10:02 p.m. Lieutenant Goods acknowledged that the Defendant had been in custody for "a couple of hours" before the interview began. Other than bathroom breaks, the Defendant remained in the interview room for eleven hours.

Lieutenant Goods testified that the Defendant often changed his answers to the questions while the transcriptionist typed the statement. Lieutenant Goods said that after the written statement was completed, the Defendant reviewed it and made additional changes. Lieutenant Goods acknowledged that his partner stated in his supplemental record that "this guy paid more attention to what was being typed and what was being said in his statement than anybody we've ever come across." Lieutenant Goods said the Defendant made the modifications in an effort to minimize his culpability.

Craig Harper testified that he was an instructor at Rangemaster, a firearm and self-defense training facility in Memphis. He said the State of Tennessee mandated eight hours of training to obtain a handgun carry permit. During the training, instructors taught firearm safety, marksmanship, the legal aspects of self-defense, firearm maintenance, ammunition, and methods of carrying the firearm. Mr. Harper stated that students were required to pass written and marksmanship tests to obtain a permit. During the

marksmanship test, students were required to fire fifty rounds at a target, including twenty rounds fired from three yards, twenty rounds from five yards, and ten rounds from seven yards. The written examination consisted of thirty-three questions with a mixture of true/false questions, multiple choice questions, and "fill in the blank" questions.

Mr. Harper testified that the Defendant graduated from the class on April 27, 2000. The Defendant obtained perfect scores on both the marksmanship and written tests.

On cross-examination, Mr. Harper testified that Rangemaster offered low-light shooting scenario classes. He stated that in the permit class, students were taught not to discharge a firearm in the dark due to the inability to identify the target. Mr. Harper found no record of the Defendant's having taken the low-light scenario class.

J.C. was age six at the time of the trial and testified that when she lived with the victims, her grandparents slept in one bedroom, she and her mother slept in another bedroom, and A'Reco slept on the couch. J.C. recalled that the Defendant shot her grandparents and her mother. She said that the gun was loud and that she was afraid. Her grandparents were in their bedroom when they were shot. J.C. saw her grandmother on the floor and her grandfather with blood on his chin. J.C. said that the Defendant hurt her mother in the living room and that she saw her mother lying by the door. J.C. stated that she had been sleeping prior to the shooting and that she did not see anyone fighting before her grandparents were shot.

J.C. testified that after the shooting, she and the Defendant left in her mother's car. She said that she did not want to go with the Defendant. J.C. said they later got into another vehicle with additional people and ultimately drove to the police station.

On cross-examination, J.C. acknowledged that other people had spoken to her about the shooting. She did not recall telling anyone that the Defendant and her grandfather fought and that her grandfather kicked the Defendant.

J.C. was interviewed by a forensic interviewer at the Child Advocacy Center. By agreement of the parties, several portions of J.C.'s interview were played for the jury. The recording of the interview was not received as an exhibit and is not included in the appellate record.

Adrienne Lewis, the mother of the Defendant's eight-year-old daughter, Y.C., testified for the defense that in January 2012, she was living in Memphis and was working from 12:15 a.m. to 7:45 or 8:00 a.m. She said that on January 19, 2012, the Defendant called her between 5:00 and 6:00 a.m. and sounded scared. He said he needed

her to help him "think" and asked her to leave work. Ms. Lewis met the Defendant at a truck stop down the street from her workplace approximately twenty minutes later. The Defendant and J.C. were in Pashea's black Cadillac Escalade. The Defendant, J.C., and Ms. Lewis left in Ms. Lewis's Ford Taurus and went to her home.

Ms. Lewis testified that the Defendant was nervous, scared, shaking, and crying. She said that he was "constantly apologizing" and told her, "I just don't want you to judge me and I want to tell you before you hear it from someone else." He said he shot "them" and "flipped out." He told Ms. Lewis that he and Pashea began arguing between midnight and 1:00 a.m. because he believed that she had cheated on him, that Pashea initially denied it but later admitted to being with another man, and that Pashea provided details about what had occurred. He stated that he attempted to leave but that Pashea would not allow it. He also stated that while they were arguing, Pashea's father came out of his bedroom and kicked the Defendant in the chest. The Defendant said he "flipped out" and began shooting. Ms. Lewis asked the Defendant how he knew who to shoot, and he replied, "[I]t was dark in the room. I just started shooting." The Defendant said he knew that if he did not shoot his way out of the house, "they [were] going to get him." He told Ms. Lewis that he did not know who had been shot but that he saw Pashea's leg bleeding. He stated that A'Reco had witnessed the incident and needed to tell the truth. Ms. Lewis recalled that the Defendant was still scared and agitated when he was describing what had occurred.

Ms. Lewis testified that the Defendant told her that he wanted his children with him because he did not know when he would see them again. They went to Ms. Lewis's home to retrieve their daughter and later went to the Defendant's sister's home. While at his sister's home, the Defendant learned from a television broadcast that at least two of the victims had died. Ms. Lewis said the Defendant began crying, dropped his head, and walked out of the room. After leaving the Defendant's sister's home, they drove to the Raines Station precinct, where the Defendant surrendered to the police.

On cross-examination, Ms. Lewis testified that the Defendant never told her that he shot Patricia. He also did not tell her that anyone shot at him or that anyone had any other weapon.

At the conclusion of the evidence, the jury convicted the Defendant of three counts of first degree premeditated murder, attempt to commit first degree murder, possession of a firearm with the intent to go armed during a dangerous felony, employing a firearm during the commission or attempt to commit a dangerous felony, and unauthorized use of a motor vehicle. The jury found the predicate felony for both firearm offenses to be attempted first degree murder.

- 22 -

## Penalty Phase

Stacey Polk, Patricia's niece, testified that she and Patricia grew up together in the same house and were raised as sisters. Ms. Polk said that their relationship continued into adulthood and that a hole existed in her family due to Patricia's death. Ms. Polk testified regarding the effect of Patricia's death on Patricia's sons, Antonio and A'Reco. She said that her family did not see Antonio for weeks and that he would not return calls or respond to text messages. She described Antonio as a "functioning depressed adult." Antonio also had a daughter, whom Patricia never met.

Ms. Polk testified that following the killings, A'Reco stopped communicating with the family except through text messages. A'Reco did not resume communications until the family began preparing for the trial. When A'Reco first met with the prosecutors, he fell on his knees, cried, and apologized. His family told him that he did nothing wrong.

Oddye Fisher, Arithio's younger brother, testified that Arithio was a role model and that through Arithio's encouragement, Oddye attended college with basketball and academic scholarships. Arithio had cancer when he was a senior in high school and had lost one of his kidneys and a portion of his stomach. In May 2013, Oddye received the worst employment evaluation that he had ever received, and the supervisor included a note stating that everything Oddye had experienced would have affected anyone. Oddye said that Antonio and Arithio were best friends and that Antonio attended counseling and missed work following his family's deaths. Antonio and the remainder of the family had tried to fill the hole created by the victims' deaths.

Kyvonna Davis, Pashea's cousin, testified that she and Pashea were best friends and were like sisters. Ms. Davis said that she felt lost without Pashea and that Pashea's death had left a "gap" in her family. Ms. Davis testified that J.C. missed Pashea and had written Pashea letters. J.C. also had imagined that Pashea was with her and had pretended to have conversations with her.

Memphis Police Lieutenant Anthony Mullins, an expert in blood stain patterns and crime scene investigation, testified that Pashea was shot twice in the leg and that he believed she was shot while in the master bedroom or in the hallway before she entered the master bedroom. He noted one of the photographs taken of Pashea's leg showed that blood had saturated her pants. A splinter of wood was on Pashea's pants, and splintered wood was found only in the master bedroom. Lieutenant Mullins stated that because the splintered wood was stuck to the blood on the leg of her pants, the blood was there before the splinter.

- 23 -

Lieutenant Mullins testified that impact spatter stains were found on the bottom of Pashea's feet. He explained that the blood stains had a specific pattern indicating that someone else's blood impacted her feet. He further explained that determining Pashea's position when the blood impacted her feet was difficult because she moved after the blood struck her feet.

Lieutenant Mullins testified that he believed Pashea and the Defendant were arguing in the kitchen, Pashea's bedroom, and the bathroom when Arithio intervened. Lieutenant Mullins concluded that Arithio, Patricia, and Pashea moved to the master bedroom with the door closed, and the Defendant began shooting through the door. Lieutenant Mullins noted that one bullet traveled through the door and continued into the bedroom wall and closet. Another bullet traveled through the door frame, and Lieutenant Mullins concluded the gun was fired from close range because gunpowder residue was on the door frame. He believed that Pashea was in the master bedroom when her parents were shot and that blood on the bottom of her feet belonged to one of her parents.

Lieutenant Mullins testified that he believed Arithio was shot first. He also believed that when the Defendant shot through the door, one of the bullets struck Arithio as he was bent over attempting to hold the door closed. The bullet entered Arithio's neck and exited through his upper back, which Lieutenant Mullins said was consistent with Arithio being bent over when he was shot. Arithio fell on the bed, where a large pool of blood was found. The wound was fatal, and he expired quickly. Lieutenant Mullins said the Defendant was able to get the door open with Patricia and Pashea in the bedroom.

Lieutenant Mullins testified that in his opinion, Patricia was shot and that some of her blood expelled onto the bed. Patricia then ran around the room and ended up on the floor by the television. Lieutenant Mullins believed Patricia received additional gunshot wounds while she was running around the bedroom. He noted multiple defects in the walls caused by bullets and said all of the shots could have been fired while the Defendant was standing in one spot. Lieutenant Mullins stated that it appeared the Defendant was "tracking" Patricia as she was attempting to escape.

Lieutenant Mullins testified that once Pashea left the master bedroom with the Defendant, she transferred blood from what appeared to be her pants to the heater box at the end of the hallway. Lieutenant Mullins said Pashea and the Defendant went to the living room/dining room area where Pashea received either a fatal or immediately incapacitating gunshot wound to her head. Lieutenant Mullins noted stippling on her face and searing in the wound and said the muzzle of the gun was six inches or less from Pashea's temple when the gun was fired.

Lieutenant Mullins testified that the shot through the arm of the couch would have killed A'Reco if he had been lying there. Lieutenant Mullins said the shot appeared to be a deliberate and at a specific target. He also said that all of the shots appeared to be deliberate, aimed shots except for the bullet that hit the wall near the ceiling in the master bedroom.

Lieutenant Darren Goods testified that the Defendant indicated Pashea was in the master bedroom when the shots were fired. Lieutenant Goods said that the Defendant stated he used his shoulder to force his way into a room to get Pashea. Lieutenant Goods said the master bedroom door was the only door with damage. He also said he did not believe the 9-1-1 recordings supported the Defendant's claim that he left the house and returned to retrieve the keys.

Lieutenant Goods testified that in the Defendant's oral statement, the Defendant said A'Reco normally slept on the couch but that in the written statement, the Defendant said A'Reco slept in the recliner. The Defendant also discussed walking into the living room and shooting downward into the couch where A'Reco generally slept. Lieutenant Goods stated that the Defendant's actions suggested his intent to shoot A'Reco.

Robert Gowen, a member of the capital defense team of the Shelby County Public Defender's Office, testified for the defense that he initially assisted in representing the Defendant. Mr. Gowen said that the defense presented a plea offer to the State. Defense counsel spoke to the Defendant about settling the case, and the Defendant signed paperwork agreeing to a plea whereby he would receive consecutive sentences of life imprisonment without parole. Mr. Gowen explained that this was the most severe sentence the Defendant could have agreed to receive. The offer was rejected by the Shelby County District Attorney General.

Tawana Brown, the Defendant's sister, testified that she had two brothers and two sisters and that the Defendant was her youngest sibling. They had the same biological mother and father. During their childhood, their father served a sentence for a rape conviction. Ms. Brown stated that when she and the Defendant were growing up, the Defendant was funny, was not a bad person, and did not engage in fights.

Ms. Brown testified that the Defendant's male role model when he was younger was their mother's husband, Jesse Harvey. Mr. Harvey and the Defendant were close, and Mr. Harvey treated the Defendant and his siblings as though Mr. Harvey were their biological father. Mr. Harvey passed away after complications from three aneurysms and while the Defendant was comforting him. Ms. Brown believed the Defendant lost an important person in his life and said he became quieter as a result.

- 25 -

Ms. Brown testified that the Defendant had two daughters, J.C. and Y.C.  She said Y.C. was age seven or eight at the time of the trial and was "crazy" about the Defendant. She also said Y.C. regularly visited the Defendant and spoke to him on the telephone. Ms. Brown believed it would hurt Y.C. if the Defendant were sentenced to death.

Ms. Brown testified that she loved Pashea and that Pashea was like a sister.  Ms. Brown had seen Pashea three days before the killings, and Pashea had discussed getting married and moving into a condominium.  Ms. Brown said she missed and loved the Defendant.  She apologized to the Fisher family on behalf of her family.

Adrienne Lewis testified that she met the Defendant at a party when she was age fifteen and that they began a romantic relationship.  She said Y.C. was born prematurely and was hospitalized for two months.  She said the Defendant visited Y.C. daily.  Ms. Lewis and the Defendant remained close friends and co-parented Y.C.  Ms. Lewis stated that Y.C. was age five when the Defendant was arrested.  Ms. Lewis said that Y.C. and the Defendant maintained a close relationship following his arrest but that Y.C. did not understand why she could not see the Defendant.  Ms. Lewis said it would hurt Y.C. if the Defendant were sentenced to death.  A video recording of Y.C. was shown to the jury but was not received as an exhibit and is not included in the appellate record.

Tameka Rhodes, the Defendant's sister, testified that the Defendant was "fun" and was someone in whom she could confide.  She stated that the Defendant and Pashea attended family dinners together and that she saw them as a happy couple.  Ms. Rhodes said that she and her mother still loved the Defendant and that he was sorry for what he had done.

At the conclusion of the penalty phase, the jury found the following aggravating circumstances beyond a reasonable doubt for each of the three first degree murder convictions:  (1) the Defendant "knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder," and (2) the Defendant committed mass murder.  *See* T.C.A. § 39-13-204(i)(3), (12) (2014).[3]  The jury also found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt and imposed a sentence of death for each first degree murder conviction.

---

[3] The State also sought to establish as an aggravating circumstance that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." *See* T.C.A. § 39-13-204(i)(6) (Supp. 2011).  The jury did not find that the State had established this aggravating circumstance beyond a reasonable doubt.

Following a separate sentencing hearing and pursuant to an agreement by the parties, the trial court sentenced the Defendant to fifteen years as a Range I standard offender for the conviction of attempt to commit first degree murder, three years at 100% service for possession of a firearm with the intent to go armed during the commission of a dangerous felony, six years at 100% service for employing a firearm during the commission of a dangerous felony, and eleven months and twenty-nine days for unauthorized use of a motor vehicle.

## ANALYSIS

On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions for first degree premeditated murder and attempted first degree murder; (2) the trial court erred in denying the Defendant's motion to suppress his statements to the police; (3) double jeopardy principles prohibit his dual convictions for possessing a firearm with the intent to go armed during the commission of a dangerous felony and employing a firearm during the commission or attempt to commit a dangerous felony; (4) the trial court erred in admitting photographs of the victims during the penalty phase; (5) the trial court erred in admitting recordings of two 9-1-1 calls made from the victims' residence around the time of the murders; (6) Lieutenant Goods' testimony during redirect examination was improper in numerous respects; (7) Tennessee's death penalty scheme constitutes cruel and unusual punishment; (8) Tennessee's death penalty scheme is unconstitutional in numerous other respects; and (9) the Defendant's sentences of death are disproportionate.

### I.  Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions for three counts of first degree premeditated murder and attempted first degree murder. He argues that the evidence is insufficient to support premeditation. The State responds that the evidence is sufficient to support the convictions. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).  The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521.  The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact."  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

A defendant commits criminal attempt when he acts "with the kind of culpability otherwise required for the offense . . . [and] [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" T.C.A. § 39-12-101(a)(2). Relevant to this case, first degree murder is the unlawful, intentional, and premeditated killing of another. *Id.* §§ 39-13-201 (2010), 39-13-202(a)(1). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (Supp. 2011) (amended 2014) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). A premeditated act is one which is

> done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d). The question of whether a defendant acted with premeditation is a question of fact for the jury to be determined from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Proof of premeditation may be shown by direct or circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). "It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." T.C.A. § 39-13-202(d). As a result, the jury "may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008). Our supreme court has provided a list of factors which "tend to support the existence" of premeditation and deliberation. *See Bland*, 958 S.W.2d at 660. The list includes the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Id*. (citing *Brown*, 836 S.W.2d at 541-42, *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1997)).

The record supports the jury's finding that the Defendant acted with premeditation in killing Pashea, Arithio, and Patricia and in attempting to kill A'Reco. When viewed in the light most favorable to the State, the evidence established that the Defendant became angry with Pashea after she admitted to cheating and that they argued. Pashea retreated to her parents' bedroom and closed the door. The Defendant rammed the door and fired his gun at the door in an effort to get to Pashea inside the bedroom. Once inside the bedroom, the Defendant continued shooting his gun. Fired cartridge casings were found throughout the bedroom, and multiple defects caused by bullets were found in the walls. Arithio suffered a bullet wound to the neck and a grazing wound to the upper chest. Patricia was shot in the chest, the left side, and the abdomen. At some point, the Defendant also shot Pashea in the leg.

The Defendant acknowledged that he walked through the house shooting his gun. At one point, he loaded another magazine into the gun and continued shooting. He grabbed Pashea and dragged her down the hallway to the front of the house. Pashea attempted to get away, and the Defendant told her that he was going to shoot her. The Defendant then shot Pashea in the head at close range.

The Defendant also shot the gun into the couch where he believed A'Reco was sleeping. The Defendant maintained in his statement to the police that he shot at the victims because he knew guns were in the house and that he feared A'Reco and Arithio. The jury by its verdict rejected this claim. Rather, the evidence established that none of the victims were armed and that no firearms were found in the house. We note that the Defendant did not render aid to the victims or summon help. Rather, he fled the scene in Pashea's vehicle. He later abandoned the vehicle, got in another vehicle, and traveled to multiple locations. It was not until he was contacted by police officers that he surrendered. We conclude that this evidence is sufficient to establish premeditation and that the Defendant is not entitled to relief on this basis.

## II. Denial of the Suppression of the Defendant's Statements

The Defendant asserts that the trial court erred in denying his motion to suppress his statement to the police. According to the Defendant, his statements were obtained in violation of his Fourth Amendment rights to a prompt probable cause determination following a warrantless arrest. The State responds that the Defendant's statements were properly admitted during the trial. We agree with the State.

### 1. Suppression Hearing

Before the trial, the Defendant filed a motion to suppress his statement to the police on the basis that it was obtained in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and Article I, Sections 8 and 9 of the Tennessee Constitution. The Defendant alleged that he was arrested without a warrant on January 19, 2012, at 8:43 a.m., after he surrendered to the police. He further alleged that before giving his statement, he was denied medical treatment, that his request for counsel was ignored, that he only had a ninth grade education, and that he smoked marijuana within twenty-four hours of giving his statement. The Defendant also alleged that "[a]n affidavit of complaint was sworn against [him on] January 20, 2012 at 11:34 a.m., almost 27 hours after his arrest." In the "Analysis" portion of his motion, the Defendant asserted

> he was arrested without a warrant, and that his mental and medical conditions at the time of his warrantless arrest demonstrate that any statements made to the police were not voluntary under *State v. Huddleston*, [924 S.W.2d 66 (Tenn. 1996)], thus violating his Fifth Amendment right against self-incrimination. Defendant's Sixth Amendment right to counsel was violated; additionally, he was held unlawfully while police elicited a statement, waiting to get the statement before taking Defendant before a magistrate.

The remainder of his motion discussed the issue of the voluntariness of his statement under the Fifth Amendment and Article I, section 9 of the Tennessee Constitution and whether his right to counsel was violated under the Sixth Amendment.

During the suppression hearing, Lieutenant Goods testified that he first met with the Defendant in the interview room on January 19, 2012, at 2:30 p.m., when he escorted the Defendant to the restroom. Lieutenant Goods said Sergeant Murray, the case coordinator, assigned him to interview the Defendant later that afternoon. Lieutenant Goods stated that before conducting an interview of a suspect, a victim, or a witness, officers gathered as much evidence as possible in order to determine whether the person was being truthful.

Lieutenant Goods testified that at approximately 4:20 or 4:25 p.m., he and Sergeant Joe Stark entered the interview room to question the Defendant. Neither officer was armed. The Defendant was not handcuffed but had one ankle shackled to a bench that was bolted to the floor. Lieutenant Goods said he and Sergeant Starks introduced themselves, told the Defendant they were investigating the homicides, and obtained personal information from the Defendant.

Lieutenant Goods testified that the Defendant was "very coherent" and had no issues understanding the questions. The Defendant stated he had completed the ninth grade, denied consuming alcohol or prescription drugs prior to the interview, and said that he had smoked marijuana at 8:00 or 9:00 p.m. the previous night. Lieutenant Goods said the Defendant did not appear to have any affects from smoking marijuana when he was interviewed.

Lieutenant Goods testified that before he advised the Defendant of his *Miranda* rights, the Defendant said "something to the affect that I'm sorry. I didn't mean to do it." The Defendant then whispered, "I'm sorry." The officers told the Defendant to stop talking and advised him of his rights. Lieutenant Goods stated that he read the Advice of Rights form to the Defendant and then had the Defendant read the form aloud. The Defendant wrote "yes" next to the questions of whether he understood his rights and whether he wished to speak to the officers. Lieutenant Goods said the Defendant had no questions regarding his rights or his understanding of his rights. The Defendant signed the Advice of Rights form at 4:32 p.m.

Lieutenant Goods testified that the Defendant gave an oral statement, which was not "exactly consistent with the evidence." The officers confronted the Defendant with the initial evidence from the scene and from medical personnel. Lieutenant Goods said he played the recording of the 9-1-1 call during which Pashea begged the Defendant not to kill her parents. The Defendant responded that Pashea was "playing" because he had already shot her parents. Lieutenant Goods stated that the oral statement lasted approximately one hour, during which time the Defendant changed his story more than once. Lieutenant Goods also stated that while giving the oral statement, the Defendant never stopped the interview and never requested counsel. Lieutenant Goods said that had the Defendant requested counsel, he would have stopped the interview immediately.

Lieutenant Goods testified that the Defendant was not free to leave regardless of his statements during the interview. Lieutenant Goods stated that the Defendant was under arrest and was going to jail regardless of whether the Defendant stopped the interview. Toward the beginning of the interview, Lieutenant Goods told the Defendant that "you're going to jail. You just killed a family. You are going to jail."

Lieutenant Goods testified that the Defendant said he was willing to give a written statement. The Defendant was advised of his *Miranda* rights. A transcriptionist typed Lieutenant Goods's questions and the Defendant's answers verbatim while the Defendant watched on a monitor what the transcriptionist typed. Lieutenant Goods stated that there were times when the Defendant stopped the transcriptionist and instructed her to correct or change an answer. Once the statement was completed, the Defendant was given a copy of the statement to read and to make corrections. Lieutenant Goods said that the

written statement began at 6:55 p.m., that the statement ended at 8:43 p.m., and that the Defendant signed the statement at 10:02 p.m. Lieutenant Goods also said the Defendant "made more corrections in his statement . . . than I've ever seen in all my years of police work."

Lieutenant Goods testified that the Defendant may have gotten a scrape on his back during the shooting. Lieutenant Goods said that Sergeant Stark offered to call an ambulance when the Defendant was initially brought to the interview room and that the Defendant declined. Lieutenant Goods stated that the Defendant never mentioned the scrape or complained of his back hurting during the interview. Lieutenant Goods also stated that had the Defendant requested medical attention, he would have stopped the interview and requested an ambulance.

Lieutenant Goods testified that during the third or fourth question of the written statement, the Defendant asked, "What if I want an attorney?" Lieutenant Goods said he told the Defendant that they would stop the interview and allow him to consult with counsel. Lieutenant Goods explained that the Defendant was being charged with three homicides regardless of any statement. Lieutenant Goods stated that the Defendant was "crystal clear" that he wished to continue with his statement. Lieutenant Goods also stated that had the Defendant not been "crystal clear," the officers would not have continued the interview. Lieutenant Goods denied that the Defendant requested an attorney and that the officers ignored the request and continued questioning him.

Lieutenant Goods testified that the Defendant did not appear to have difficulty understanding the interview process, his rights, or the questions. Lieutenant Goods said the Defendant was attentive and recalled details. He also said that the changes the Defendant made in his statement appeared to be an effort to benefit him or mitigate his conduct. Lieutenant Goods stated that the Defendant's lack of a high school education did not affect his ability to answer the questions appropriately. Lieutenant Goods recalled that at one point, the officers decided to take a break and were about to leave when the Defendant stated that he wanted to continue the interview. The officers continued the interview.

Lieutenant Goods testified that neither he nor his partner touched the Defendant, threatened him, or coerced him into giving a statement. Lieutenant Goods stated that after the Defendant signed his statement, the Defendant commented that "he didn't know why we were so upset. It wasn't a big deal." Lieutenant Goods told the Defendant that "he had lost his f------ mind. He had just killed a whole family." The officers called for a transport car to take the Defendant to the jail for processing. Lieutenant Goods did not have any further contact with the Defendant during the course of his investigation.

On cross-examination, Lieutenant Goods testified that the Defendant took one hour and fifteen minutes to review his statement and to make corrections. The statements were not audio recorded. On redirect examination, Lieutenant Goods testified that the Defendant was provided food, water, and restroom breaks. Lieutenant Goods said he continued questioning the Defendant because he believed that the Defendant was lying during his initial statement.

Following the hearing, the trial court entered an order denying the Defendant's motion to suppress. The trial court found that the Defendant made a knowing and voluntary waiver of his rights, was not intoxicated at the time of questioning, did not require medical care, did not make an unequivocal request for counsel, and gave a voluntary statement to the police.

## 2. Analysis

As a preliminary matter, the State asserts that the Defendant has waived the Fourth Amendment issue by failing to raise the issue during the suppression hearing or in his motion for a new trial. We note the Defendant included no argument or analysis on the Fourth Amendment issue in his motion to suppress. Rather, he focused upon the Fifth and Sixth Amendment issues and did not raise an alleged Fourth Amendment violation. After the trial court issued its order, the Defendant did not request the court address the Fourth Amendment issue. We conclude that the Defendant did not raise the alleged Fourth Amendment violation in his motion to suppress or during the suppression hearing. Furthermore, the Defendant failed to raise the issue in his motion for new trial. Therefore, the issue is waived. *See* Tenn. R. App. P. 3(e), 36(a). Our review is limited to plain error.

The Defendant bears the burden of persuading this court that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial. *State v. Bledsoe*, 226 S.W.3d 349, 354-55 (Tenn. 2007). Under plain error review, relief will only be granted when five prerequisites are met: (1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the accused did not waive the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice. *State v. Gomez*, 239 S.W.3d 733, 737 (Tenn. 2007).

The Fourth Amendment to the United States Constitution "requires a timely judicial determination of probable cause as a prerequisite to detention." *Gerstein v. Pugh*, 420 U.S. 103, 125 (1975). When a person is arrested without a warrant, he or she must be brought before a magistrate to "'seek a prompt judicial determination of probable

cause.'" *State v. Bishop*, 431 S.W.3d 22, 42 (Tenn. 2014) (quoting *Gerstein*, 420 U.S. at 125); *see* Tenn. R. Crim. P. 5(a)(1); *State v. Huddleston*, 924 S.W.2d 666, 672 n.2 (Tenn. 1996). A delay of less than forty-eight hours is "presumptively reasonable." *Bishop*, 431 S.W.3d at 42. When the delay exceeds forty-eight hours, the State must demonstrate that "'a bona fide emergency or other extraordinary circumstance' caused the delay." *Id.* (quoting *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991)). A delay of less than forty-eight hours may be unreasonable "if the delay is 'for the purpose of gathering additional evidence to justify the arrest' or if the delay is 'motivated by ill will against the arrested individual, or delay for delay's sake.'" *Id.* (quoting *McLaughlin*, 500 U.S. at 56). Furthermore,

> [c]ourts cannot ignore the often unavoidable delays in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest, and other practical realities.

*McLaughlin*, 500 U.S. 56-57.

When an officer fails to bring a defendant before a magistrate without unnecessary delay, the exclusionary rule applies. *Huddleston*, 924 S.W.2d at 673. Under the "fruit of the poisonous tree" doctrine, any evidence obtained due to a defendant's unlawful detention must be excluded from the trial unless the defendant's statement was "'sufficiently an act of free will to purge the primary taint'" of the illegal detention. *Bishop*, 431 S.W.3d at 42 (quoting *Huddleston*, 924 S.W.2d at 674-75). When a suspect is arrested based on probable cause, the detention generally is not illegal until it "ripens" into a *Gerstein* violation. *Id.* (citing *Huddleston*, 924 S.W.2d at 675). If the suspect gave a statement "prior to the time the detention ripened into a constitutional violation, it is not the product of the illegality and should not be suppressed." *Huddleston*, 924 S.W.2d at 675.

We conclude that the Defendant has failed to establish the breach of a clear and unequivocal rule of law. Nothing in the record shows when the judicial determination of probable cause occurred. While the Defendant maintains that the judicial determination of probable cause occurred at 11:34 a.m. on January 20, 2012, he has not cited to any portion of the record to support his claim.[4] Absent evidence of when the judicial

---

[4] While the Defendant stated in his motion to suppress that the affidavit of complaint was sworn against him at 11:34 a.m. on January 20, 2012, the affidavit of complaint was not included in the appellate record.

- 34 -

determination of probable cause occurred, we cannot conclude that the delay was unreasonable and in violation of the Fourth Amendment.

In any event, we note that even if the judicial determination of probable cause occurred at 11:34 a.m. on January 20, 2012, the delay was within forty-eight hours and, therefore, was not presumptively unreasonable. *See Bishop*, 431 S.W.3d at 42. Nothing in the record shows that the delay was "'motivated by ill will against the arrested individual, or delay for delay's sake.'" *Id.* (quoting *McLaughlin*, 500 U.S. at 56). Furthermore, the Defendant has failed to establish that the delay was "'for the purpose of gathering additional evidence to justify the arrest.'" *Id.* (quoting *McLaughlin*, 500 U.S. at 56). Rather, the officers had probable cause to arrest the Defendant based upon the 9-1-1 calls, A'Reco's identification of the Defendant as the shooter, and the Defendant's flight from the scene in Pashea's vehicle. *See State v. Lewis*, 36 S.W.3d 88, 98 (Tenn. Crim. App. 2000) (stating that "[p]robable cause in the context of a warrantless arrest exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense") (citations omitted). Accordingly, we conclude that the Defendant's Fourth Amendment rights were not violated and that he is not entitled to relief on to this issue.

### III. Double Jeopardy

The Defendant contends that his dual convictions for possession of a firearm with the intent to go armed during the commission of a dangerous felony and employing a firearm during the commission or attempt to commit a dangerous felony violate double jeopardy principles. The State concedes the convictions should merge, and we agree.

Our supreme court announced our current double jeopardy analysis in *State v. Watkins*, 362 S.W.3d 530 (Tenn. 2012). In *Watkins*, the court abandoned the analysis provided previously in *State v. Denton*, 938 S.W.2d 373 (Tenn. 1996), and adopted the "same elements" analysis delineated by the United States Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 304 (1932). Therefore, whether dual convictions violate double jeopardy principles requires a determination of "whether the convictions arise from the same act or transaction." *Watkins*, 32 S.W.3d at 557. If the convictions arise from the same act or transaction, the second inquiry is whether the elements of the offenses are the same or whether one offense is a lesser included offense of the other. *Id.* If the elements are the same or one offense is a lesser included offense of the other, dual convictions violate double jeopardy principles. *Id.* Appellate courts "will presume that multiple convictions are not intended by the General Assembly" when the elements of the offenses are the same or when one offense is a lesser included offense of the other. *Id.*

The jury found that the dangerous felony for both firearm convictions was attempted first degree murder. Based upon the evidence presented at trial, we conclude that the firearm convictions arose from the same act or transaction. Furthermore, possession of a firearm with the intent to go armed during the commission of a dangerous felony is a lesser included offense of employing a firearm during the commission of a dangerous felony. *State v. Fayne*, 451 S.W.3d 362, 370 (Tenn. 2014). Accordingly, we conclude that the Defendant's dual firearm convictions violate the principles of double jeopardy. We remand the case to the trial court for entry of corrected judgment forms reflecting merger of the possession of a firearm with the intent to go armed during the commission of a dangerous felony conviction with the employing a firearm during the commission or attempt to commit a dangerous felony conviction. *See State v. Davis*, 466 S.W.3d 49, 77-78 (Tenn. 2015) (providing that when dual convictions violate the principles of double jeopardy, the lesser offense should be merged into the greater offense).

## IV. Admission of Photographs During the Penalty Phase

The Defendant contends that the trial court erred in admitting three photographs depicting the face of each victim during the penalty phase of the trial. The State contends that the trial court did not abuse its discretion in admitting the photographs. We agree with the State.

During a jury-out hearing, the prosecutor stated that she was seeking to introduce the three photographs in support of the mass murder aggravating circumstance. One photograph was taken at the crime scene and depicted the side of Pashea's head and her shoulder. The second photograph also was taken at the crime scene and depicted Arithio's face after officers rolled over his body. The third photograph depicted Patricia's face and was taken at the Med. Trial counsel objected and argued that the photographs were unnecessary because the jury had convicted the Defendant of killing three people. Counsel asserted that the mass murder aggravator had been established by the jury's verdict and agreed to stipulate to the mass murder aggravator. The prosecutor declined to stipulate and argued that the State was required to prove its case and that the photographs would provide a greater impact than a stipulation.

The trial court found that while the photographs were "extremely, highly prejudicial," they were admissible during the penalty phase. The court noted that the State was required to establish the aggravating circumstances. The court expressed concern regarding the reaction of the victims' family upon viewing the photographs during the penalty phase and any impact that such a reaction might have on the jury. The prosecutor assured the court no outbursts would occur. During the penalty phase, Lieutenant Mullins testified regarding the aggravating circumstances, and the three

photographs were introduced to support his testimony. The record does not reflect any outbursts from the trial spectators.

The Defendant maintains that the trial court abused its discretion in admitting the photographs because the photographs were cumulative to evidence presented at the guilt phase and because defense counsel had offered to stipulate to the mass murder aggravator. In *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978), our supreme court provided trial courts with guidance for determining the admissibility of relevant photograph evidence. The trial court should consider: the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions. *Banks*, 564 S.W.2d at 951. The supreme court noted the State's burden in establishing that the probative value of particularly gruesome photographs outweighs any prejudicial effect is often difficult to meet "[i]n the presence of an offer to stipulate the facts shown in the photograph." *Id.* This standard, however, "applies only during the guilt phase of the trial under the more rigid guidelines established by our Rules of Evidence." *State v. Odom*, 336 S.W.3d 541, 566 (Tenn. 2011) (citing *Banks*, 564 S.W.2d at 949-51). Although the Tennessee Rules of Evidence govern the admissibility of photographs at the trial, the admission of photographs during the penalty phase of a capital case is governed by Tennessee Code Annotated section 39-13-204(c). *See id.* at 564. The statute provides for the admission of evidence on "any matter that the court deems relevant to the punishment," including "any evidence tending to establish or rebut the aggravating circumstances . . . regardless of its admissibility under the rules of evidence." T.C.A. § 39-13-204(c); *see also State v. Carter*, 114 S.W.3d 895, 903 (Tenn. 2003) (providing that under this statute, "any evidence relevant to the circumstances of the murder, the aggravating circumstances relied upon by the State, or the mitigating circumstances is admissible if such evidence has probative value in the determination of punishment").

A trial court may use the Tennessee Rules of Evidence as guidance during the penalty phase of a capital murder trial. *Carter*, 114 S.W.3d at 903. However, the Rules of Evidence "should not be applied to preclude introduction of otherwise reliable evidence that is relevant to the issue of punishment, as it relates to mitigating or aggravating circumstances, the nature and circumstances of the particular crime, or the character and background of the individual defendant." *State v. Sims*, 45 S.W.3d 1, 14 (Tenn. 2001). Rather, the trial court must examine the "reliability, relevance, value, and prejudicial effect" of the evidence. *Id.* "The admission of photographs lies within the sound discretion of the trial court and will not be overturned on appeal absent a showing that the trial court abused that discretion." *Odom*, 336 S.W.3d at 565.

We conclude that the trial court did not abuse its discretion in allowing the State to introduce the photographs. The photographs were relevant to establishing the mass murder aggravating circumstance. *See* T.C.A. § 39-13-204(i)(12). The photographs were not unduly gruesome or unfairly prejudicial in light of the other evidence presented at the trial, and the number of photographs was limited to one for each victim. The Defendant is not entitled to relief with regard to this issue.

## V. Admission of the Recordings of the 9-1-1 Calls

The Defendant maintains that the trial court erred in denying his motion to exclude the audio recordings of the two 9-1-1 calls. He asserts that the recordings were irrelevant and unfairly prejudicial. The State responds that the trial court did not abuse its discretion in permitting the State to play the recordings to the jury. We agree with the State.

Prior to the trial, the Defendant filed a motion to exclude the recordings and the transcripts of the two 9-1-1 calls. He argued that the recordings were highly prejudicial. Trial counsel stated that they were willing to stipulate to the identities of the three murder victims and that their bodies were found after 9-1-1 dispatch sent ambulances to the victims' home. The Defendant argued that as a result, the recordings had little probative value and that playing the recordings would only elicit an emotional response from the jury. He also requested that the transcripts of the calls be excluded as inherently unreliable and inadmissible hearsay.

Following a hearing, the trial court entered an order on April 7, 2014, denying the Defendant's motion to exclude the recordings. The trial court found that both calls were relevant to establishing identity, state of mind, and premeditation.

With regard to the recording of the 9-1-1 call made by A'Reco, the trial court found as follows:

> The caller clearly relays to the 911 operator the events that have occurred. It is not difficult to hear the caller or the operator and both the caller and operator can be easily understood. The call is relevant as it provides a snapshot of the events surrounding the murders as they occurred in real time. The caller identifies the perpetrator and provides details surrounding the timeline of the murder and the state of mind and intent of the defendant. While there appears to be a victim moaning in the background, this court does not find the tape is inflammatory or overly prejudicial when weighed against its probative value.

During a hearing prior to entering the order, the trial court also stated that "the call primarily consists of the caller relatively calmly informing the officers of the events that have transpired" and that as a result, the recording of the call is not "overly inflammatory."

During a hearing prior to entering the order, the trial court also described the "open line" call as "incredibly difficult to listen to. There is screaming. One of the victims is moaning and the victim [is] pleading for her life, her parent's lives and the child's life." In its written order, the trial court found as follows:

> The call is chaotic and contains multiple voices. There is screaming from [the] victim, [Pashea] Fisher, the victim's small child[,] and the defendant. In addition, at one point during the call, the subsequent call from [A'Reco] may be heard in the background and a victim can be heard moaning. However, despite the fact that it is difficult to discern all of the statements being made by the various individuals who can be heard on the call, this court finds the call is highly relevant to the issue of identity and premeditation. The call gives a real time snapshot of what occurred inside the house at the time of the shooting. Additionally, the call contains the statements of the defendant which may rebut the statement given by defendant to police. Moreover, the tape is necessary to aid the state in establishing a timeline of the events as they unfolded. For these reasons, the court finds the probative value of the 911 call is great when compared to the potential prejudice to the defendant; thus, the tape may be admitted at trial.

The trial court found that the statements made during the calls qualified under the excited utterance exception to the hearsay rule. *See* Tenn. R. Evid. 803(2). The trial court also allowed the State to introduce a redacted version of the transcript of the 9-1-1 call made by A'Reco but precluded the State from introducing a transcript of the "open line" call.[5] The trial court ordered collection of the copies of the transcript after the recording was played and said a special instruction would be given to the jury.

Evidence is relevant if it has "any tendency to make the evidence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence generally is

---

[5] The Defendant does not challenge the trial court's ruling that the statements in the calls qualified under the excited utterance exception to the hearsay rule or the court's determinations regarding the transcripts. The transcript of the 9-1-1 call made by A'Reco was not entered into evidence and was not included in the appellate record.

admissible. Tenn. R. Evid. 402. Relevant evidence, however, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of delay, waste of time, or needless presentation of cumulative evidence. Tenn. R. Evid. 403. The admissibility of evidence is within the sound discretion of the trial court, and this court will not overturn a trial court's decision regarding the admissibility of the evidence absent an abuse of that discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993).

We conclude that the trial court did not abuse its discretion in permitting the State to introduce the recordings of the 9-1-1 calls. The Defendant argues that the trial court erred in finding that the recordings were relevant to the issue of identity because identity was not a disputed issue at the trial. The State, however, has the burden of establishing every element of the charged offenses beyond a reasonable doubt, including the identity of the Defendant as the perpetrator regardless of whether a defendant disputes those issues at trial. Furthermore, the trial court correctly found that the recordings were relevant to the issues of intent and premeditation, both of which were issues at the trial. The recordings provided details surrounding the timeline of the shootings and were used to rebut portions of the Defendant's statements to the police.

Relative to prejudice, the recording of the call made by A'Reco consists of A'Reco calmly informing the officers of the shooting. The trial court properly found that the record was not "overly inflammatory." The "open line" call was more chaotic. The recording reflected that J.C. was screaming, that Pashea and the Defendant were yelling, that Pashea was begging the Defendant not to kill her parents, and that two shots were fired, after which Pashea was no longer heard in the recording. However, in light of the fact that the issues of premeditation and intent were highly contested at trial, we conclude that the probative value of the two recordings was not substantially outweighed by the danger of unfair prejudice. The Defendant is not entitled to relief on this issue.

### VI. Admission of Lieutenant Goods' Testimony

The Defendant asserts that the trial court erred in permitting Lieutenant Goods, on redirect examination, to compare the victims' homicides with other killings he had investigated and to testify regarding the impact the homicides in the present case had on him. The Defendant also asserts that the court erred in permitting Lieutenant Goods to compare the Defendant's attitude with the attitudes of other suspects Lieutenant Goods previously interviewed.

On direct examination, Lieutenant Goods testified that after he played the open line 9-1-1 recording for the Defendant, the Defendant stated that Pashea was "playing a

- 40 -

game" when she begged him not to kill her parents because he already had shot them. The prosecutor asked Lieutenant Goods how he responded, and he stated that he became angry and said "[s]omething to the effect of [you're] either full of s--- or you've lost your f------ mind." The prosecutor asked how the Defendant responded, and Lieutenant Goods initially said that the Defendant stated that "it was no big deal." Upon further questioning by the prosecutor, Lieutenant Goods corrected his testimony and stated the Defendant's statement that "it was not a big deal" occurred after the written statement was complete. Lieutenant Goods clarified that the Defendant did not respond when Lieutenant Goods became angry.

Lieutenant Goods later testified on direct examination that as they were waiting on a car to transport the Defendant to jail for processing, the Defendant "was cavalier about what had happened." Lieutenant Goods said that he became angry and that the Defendant made a statement to the effect that "I don't know why you're raising your voice. It's not a big deal." Lieutenant Goods said he told the Defendant that "he must be out of his f------ mind."

On cross-examination, trial counsel questioned Lieutenant Goods regarding the importance of preserving evidence and taking notes because "memories fade over time." Lieutenant Goods testified that although he did not take notes during the interview, Sergeant Stark took notes. In response to questioning by counsel, Lieutenant Goods said his testimony was based upon his memory and his review of Sergeant Stark's report. Counsel repeatedly questioned Lieutenant Goods about his not taking notes and not recording the Defendant's interview.

Lieutenant Goods also testified on cross-examination that the policy of the Memphis Police Department was not to record an interview with a suspect. Trial counsel asked Lieutenant Goods whether it was the policy of the Memphis Police Department to tell someone that they are "f------ crazy." Lieutenant Goods acknowledged that he made the statement to the Defendant twice and that the statement was his reaction to interacting with the Defendant. Counsel further questioned Lieutenant Goods regarding whether such a statement could be perceived as "mean" and could frighten someone.

On redirect examination, the prosecutor questioned Lieutenant Goods regarding the policy of the Memphis Police Department against recording suspect interviews, and Lieutenant Goods acknowledged that he would have recorded the interview had he been required to do so. The prosecutor then questioned Lieutenant Goods as follows:

> All right. You were asked some questions about calling the defendant or asking the defendant if he was f------ crazy. I want to follow up on that one. How many homicides do you think you've participated in?

Trial counsel objected on the basis of relevance, and the trial court allowed the prosecutor to continue after the prosecutor assured the court that she would "make it relevant." Lieutenant Goods testified that he had investigated about 200 homicides and that he specifically recalled this investigation. The prosecutor asked him, "Did it get to you?," and he responded, "Yes."

Trial counsel objected on the basis of relevance. The prosecutor responded that counsel opened the door to the testimony by questioning Lieutenant Goods about whether his use of particular language was consistent with police policy. The trial court allowed the prosecutor to question Lieutenant Goods regarding whether his reaction to the Defendant was a normal reaction based upon the number of cases that he had investigated, but the court instructed the prosecutor to rephrase the question. The prosecutor questioned Lieutenant Goods as follows:

> Q. You said you remember this one. Why do you remember this one?
>
> A. Because of the 911 tape, because of [J.C.] and listening to that tape and the first thing that I hear was her screaming, and the fact that we don't get many triple homicides in this city at one time and this was a triple homicide.
>
> Q. Do you call every person that is interviewed by yourself or ask every person that you interview are they f------ crazy?
>
> A. No, ma'am.
>
> Q. And what was the reason for asking [the Defendant] was he f------ crazy?
>
> A. He had a very cavalier, nonchalant attitude about the entire thing. And he made a statement I don't know why you're upset, it's no big deal or something along those lines, and so that was my response to that statement.

"The admissibility of testimony and other evidence, as well as the scope of redirect examination, is within the discretion of the trial court, whose ruling will not be reversed absent an abuse of that discretion." *State v. Chearis*, 995 S.W.2d 641, 645 (Tenn. Crim. App. 1999) (citing *State v. Barnard*, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994)). The trial court "'has discretion to permit the witness on redirect to testify about new facts that were not mentioned on direct or cross-examination.'" *State v.*

*Danny Owens*, No. M2012-02717-CCA-R3-CD, 2014 WL 1173371, at *19 (Tenn. Crim. App. Mar. 24, 2014), (citing Neil P. Cohen et al., *Tennessee Law of Evidence* § 6.11[6][b] (4th ed. 2000)), *perm. app. denied* (Tenn. Sept. 25, 2014).

Contrary to the Defendant's argument on appeal, the record reflects the trial court did not allow the prosecutor to elicit testimony from Lieutenant Goods comparing the victims' homicides to other homicides he had investigated. Rather, after trial counsel objected to the prosecutor's question about whether the homicides in this case affected Lieutenant Goods, the court instructed the prosecutor to rephrase the question. The prosecutor abandoned the line of questioning and asked Lieutenant Goods why he recalled the homicides.

Lieutenant Goods's testimony that he specifically recalled these homicides because of the 9-1-1 calls and because the investigation was a triple homicide rebutted defense counsel's challenge on cross-examination to Lieutenant Goods's memory of the events. Evidence that is not admissible based on relevance may be admitted if the defendant "opens the door" by putting the issue into controversy. The doctrine of "'opening the door' is an equitable principle that permits a party to respond to an act of another party by introducing otherwise inadmissible evidence." *State v. Gomez*, 367 S.W.3d 237, 246 (Tenn. 2012). A party who raises an issue at trial "'expand[s] the realm of relevance,' and the opposing party may be permitted to present evidence on that subject." *Id.* (internal citations omitted). We conclude that counsel opened the door to the testimony during cross-examination and that, as a result, Lieutenant Goods's testimony regarding why he recalled the homicide was properly admitted.

Regarding Lieutenant Goods's testimony on redirect examination explaining why he had cursed at the Defendant, we note that Lieutenant Goods provided the same testimony on direct examination relative to the Defendant's "cavalier, nonchalant attitude" without any objection by the Defendant. Therefore, this issue is waived. *See* Tenn. R. Evid. 103(a)(1) "Error may not be predicated upon a ruling which admits ... evidence unless a substantial right of the party is affected, and ... a timely objection ... appears of record, stating the specific ground of objection if the specific ground is not apparent from the context[.]"); *see also* T.R.A.P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

Furthermore, we conclude that even if the admission of Lieutenant Goods's testimony on redirect examination was error, the Defendant failed to demonstrate that the trial court's error "more probably than not affected the judgment or would result in prejudice to the judicial process." T.R.A.P. 36(b); *see also State v. Rodriguez*, 254

S.W.3d 361, 375 (Tenn. 2008) (applying Tennessee Rule of Appellate Procedure 36(b) harmless error review to trial court's erroneous admission of evidence).

## VII. Cruel and Unusual Punishment

The Defendant asserts that Tennessee's death penalty scheme constitutes cruel and unusual punishment under the United States and Tennessee Constitutions. As a preliminary matter, the State asserts that the Defendant has waived these claims by failing to raise them in the trial court. In the Defendant's amended motion for a new trial, he claimed that the trial court erred in denying a motion to dismiss the indictment due to the unconstitutionality of Tennessee's death penalty scheme and of the death penalty in general. Neither the Defendant's motion to dismiss nor the trial court's order denying the motion is included in the appellate record. The Defendant, as the appealing party, has the burden of preparing a complete and accurate record relating to the issues on appeal. *See* T.R.A.P. 24(b). Because the Defendant has not prepared an adequate record on appeal, this issue is waived.

Regardless of waiver, we note that our supreme court has rejected claims that capital punishment violates the state and federal constitutions. *See State v. Black*, 815 S.W.2d 166, 188-91 (Tenn. 1991); *see also Baze v. Rees*, 553 U.S. 35, 47 (2008) (reaffirming that "capital punishment is constitutional" and upholding Kentucky's lethal injection protocol); *Keen v. State*, 398 S.W.3d 594, 600 n.7 (Tenn. 2012) (stating that our supreme court "has held, and repeatedly affirmed, that capital punishment itself does not violate the state and federal constitutions").

The Defendant maintains that the death penalty is imposed in an arbitrary and unreliable fashion in Tennessee because the decision of whether to seek the death penalty depends upon the county in which the trial is held. The Defendant, however, fails to establish that the geographic distribution of death sentences undermines the constitutionality of the death penalty. Rather, our supreme court has held that the discretion afforded to prosecutors to choose whether to seek the death penalty in a particular case does not render the death penalty unconstitutional. *See State v. Banks*, 271 S.W.3d 90, 154-55 (Tenn. 2008).

The Defendant asserts that "[l]engthy delays in the execution of a sentence of death rob capital punishment of the penological values of deterrence or retribution" as concluded by Justice Breyer in his dissent in *Glossip v. Gross*, __ U.S. __, __, 135 S.Ct. 2726, 2765-73 (2015). The Tennessee Supreme Court has held that the death penalty "serves the valid and legitimate penological objectives of deterrence and retribution." *Banks*, 271 S.W.3d at 160-61. Moreover, as Justice Thomas wrote, "I am unaware of any support in the American constitutional tradition or in this Court's precedent for the

proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed." *Knight v. Florida*, 528 U.S. 990 (1999) (Thomas, J., concurring in denial of certiorari). Justice Thomas explained:

> Consistency would seem to demand that those who accept our death penalty jurisprudence as a given also accept the lengthy delay between sentencing and execution as a necessary consequence. . . . It is incongruous to arm capital defendants with an arsenal of "constitutional" claims with which they may delay their executions, and simultaneously to complain when executions are inevitably delayed.

*Id.* (citations omitted). Even if systematic delays could implicate a defendant's rights under the state and federal constitutions, the Defendant has failed to demonstrate that any delay in his case rendered his sentences of death unconstitutional.

Relying upon *Woodson v. North Carolina*, 428 U.S. 280 (1976) (plurality opinion), the Defendant asserts that the death penalty is unreliable. In *Woodson*, the United States Supreme Court held that the penalty of death is qualitatively different from every other sentence. *Woodson*, 428 U.S. at 305. As a result, there is a corresponding need in capital cases for reliability in the determination that death is the appropriate punishment in a specific case. *Id.* In support of his claim, the Defendant discusses the exonerations of defendants who had been sentenced to death, including three defendants in Tennessee. The Defendant, however, fails to establish that those cases render Tennessee's death penalty statute unconstitutional.

Finally, the Defendant argues that executions are rare and randomly implemented and that executions are dependent upon the rate in which they proceed through the post-conviction process. The Defendant, however, fails to explain how this undermines the constitutionality of Tennessee's death penalty scheme. This court will not speculate, and we conclude that the Defendant is not entitled to relief on this basis.

### VIII. Constitutionality of the Death Penalty

The Defendant raises multiple constitutional challenges to Tennessee's capital sentencing scheme. As we have held, the Defendant has waived the issues by failing to include in the appellate record his motion to dismiss and the trial court's order denying the motion. Regardless of waiver, however, the Defendant is not entitled to relief.

The Defendant submits that Tennessee's capital sentencing scheme fails to meaningfully narrow the class of defendants eligible for the death penalty. He maintains

that "several" aggravating circumstances set forth in Tennessee Code Annotated section 39-13-204(i) have been so broadly interpreted that they do not provide a meaningful basis for narrowing the class of defendants eligible for the death penalty. Our supreme court has rejected this claim. *See State v. Vann*, 976 S.W.2d 93, 117-18 (Tenn. 1998); *State v. Keen*, 926 S.W.2d 727, 742 (Tenn. 1994).

The Defendant asserts that the prosecutor has unlimited discretion in selecting candidates for the death penalty which results in the arbitrary and capricious imposition of the death penalty and an improper delegation of judicial authority. "While Tennessee's district attorneys general have been entrusted with broad discretion in making charging decisions, it would be inaccurate to characterize their discretion as entirely unfettered." *Banks*, 271 S.W.3d at 154. Rather, a district attorney general's discretion is guided by the elements of the crime of first degree murder and by the aggravating circumstances as defined by the legislature. "Furthermore, the United States Supreme Court has recognized that prosecutorial discretion provides a vehicle for individualized justice." *Id.* at 155 (citing *McCleskey v. Kemp*, 481 U.S. 279, 311-12 (1987)). Our supreme court has "repeatedly rejected the argument that such discretion raises a constitutional problem." *Id.*

The Defendant maintains that the death penalty is imposed in a discriminatory manner based on race, gender, and geography. The Defendant has failed to present any evidence of discrimination in his case. Furthermore, this argument has been rejected by our supreme court. *See State v. Hester*, 324 S.W.3d 1, 78 (Tenn. 2010); *Banks*, 271 S.W.3d at 155-58.

The Defendant contends that the jury instructions required jurors to agree unanimously on the life sentence in violation of the holdings in *Mills v. Maryland*, 486 U.S. 367, 384 (1988) and *McKoy v. North Carolina*, 494 U.S. 433 (1990), which prohibit a requirement that juries reach an unanimous agreement as to the existence of mitigating circumstances. The trial court instructed the jury that "[t]here is no requirement of jury unanimity as to any particular mitigating circumstance, or that you agree on the same mitigating circumstance." Our supreme court has held that this jury instruction does not violate the mandates of *Mills* and *McKoy*. *See State v. Sexton*, 368 S.W.3d 371, 427 (Tenn. 2012).

The Defendant argues that requiring the jury to agree unanimously upon a life verdict also violates *Mills* and *McKoy*. The Tennessee Supreme Court has rejected this argument. *Hester*, 324 S.W.3d at 77; *State v. Brimmer*, 876 S.W.2d 75, 87 (Tenn. 1994).

The Defendant asserts that by requiring the jury to agree unanimously that the aggravating circumstances do not outweigh the mitigating circumstances, Tennessee

Code Annotated section 39-13-204(f) impinges on a defendant's right to have each juror consider and give effect to mitigating evidence. This argument has been rejected. *See State v. Nichols*, 877 S.W.2d 722, 735 (Tenn. 1994).

The Defendant submits that a reasonable likelihood that jurors believe they must unanimously agree to the existence of mitigating circumstances exists due to the trial court's failure to instruct the jury on the meaning and function of mitigating circumstances. The Defendant concedes that this argument was rejected generally in *State v. Thompson*, 768 S.W.2d 239, 251-52 (Tenn. 1989). However, he maintains that unlike the trial court in *Thompson*, the court in the Defendant's case did not give the special additional instruction that "[b]ecause different people may have different views about what tends to ameliorate or mitigate . . . you may weigh and consider any and all circumstances which you feel tend to mitigate the offense or defendant in question." *See Thompson*, 768 S.W.2d at 251. In the present case, the court instructed the jury that "[t]he Defendant does not have the burden of proving a mitigating circumstance. There is no requirement of jury unanimity as to any particular mitigating circumstance, or that you agree on the same mitigating circumstance." The Tennessee Supreme Court has held that this instruction "does not lead jurors to believe that they must unanimously agree on the existence of a mitigating circumstance." *Banks*, 271 S.W.3d at 157.

The Defendant maintains that the appellate review process in death penalty cases is not "meaningful" because (1) the jury is not required to make written findings of mitigating circumstances; (2) the informational basis for comparative review of first degree murder convictions is inadequate and incomplete; (3) the methodology for conducting comparative review is flawed; and (4) a defendant may waive presentation of mitigating evidence without presenting an offer of proof regarding what mitigation is available. Our supreme court has held that this claim is without merit. *Id.* at 159.

Finally, the Defendant contends that the appellate review process in death penalty cases is constitutionally inadequate because the proportionality review employed violates the due process clause of the United States Constitution and the law of the land provision of the Tennessee Constitution. *See* U.S. Const. amend. XIV, § 1; Tenn. Const. art. I, § 8. The Tennessee Supreme Court has recently upheld the comparative proportionality review conducted by appellate courts in death penalty cases. *See State v. Pruitt*, 415 S.W.3d 180, 212-16 (Tenn. 2013). Our supreme court also has recognized that "[w]hile comparative proportionality review provides an important safeguard against arbitrary and capricious sentencing, it is not constitutionally required." *Banks*, 271 S.W.3d at 159 (citing *Bland*, 958 S.W.2d at 663). The Defendant is not entitled to relief on this basis.

## IX.  Mandatory Review

When reviewing a conviction for first degree murder and an accompanying sentence of death, Tennessee Code Annotated section 39-13-206(c)(1) requires this court to review the record to determine whether:

(A)  The sentence of death was imposed in any arbitrary fashion;

(B)  The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

(C)  The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

(D)  The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

## 1.  Arbitrariness of Death Sentence

In accordance with the trial court's instructions, the jury unanimously determined that the State proved beyond a reasonable doubt that aggravating circumstances applied to each of the murders committed by the Defendant and that these aggravating circumstances outweighed the mitigating circumstances.  The record reveals that the penalty phase was conducted pursuant to the applicable statutory provisions and the rules of criminal procedure.  We conclude that the Defendant's sentences of death were not imposed in an arbitrary fashion.

## 2.  Evidence Supporting Aggravating Circumstances

We next turn to the sufficiency of the evidence supporting the aggravating circumstances found by the jury.  In considering whether the evidence supports the jury's findings of statutory aggravating circumstances, we must determine, after viewing the evidence in the light most favorable to the State, whether a rational trier of fact could have found the existence beyond a reasonable doubt of the aggravating circumstances. *State v. Rollins*, 188 S.W.3d 553, 571 (Tenn. 2006) (citing *State v. Reid*, 164 S.W.3d 286, 314 (Tenn. 2005)).

The jury applied two aggravating circumstances when imposing the death penalty for each of the Defendant's three convictions for first degree premeditated murder.  First, the jury found that the Defendant "knowingly created a great risk of death to two (2) or

more persons, other than the victim murdered, during the act of murder." T.C.A. § 39-13-204(i)(3). This aggravating circumstance "'contemplates either multiple murders or threats to several persons at or shortly prior to or shortly after an act of murder upon which the prosecution is based.'" *Johnson v. State*, 38 S.W.3d 52, 60 (Tenn. 2001) (quoting *State v. Cone*, 665 S.W.2d 87, 95 (Tenn. 1984)). This aggravating circumstance has been applied "'where a defendant fires multiple gunshots in the course of a robbery or other incident at which persons other than the victim are present.'" *Id.* (quoting *State v. Henderson*, 24 S.W.3d 307, 314 (Tenn. 2000)). This aggravating circumstance also has been applied where the defendant "'fired random shots with others present or nearby,'" "engaged in a shootout with others," or "'actually shot people in addition to the murder victim.'" *State v. Dotson*, 450 S.W.3d 1, 79 (Tenn. 2014) (quoting *Johnson*, 38 S.W.3d at 60-61).

The evidence established that the Defendant shot and killed Arithio, Patricia, and Pashea and that A'Reco and J.C. were in the home at the time of the murders. While in Arithio and Patricia's bedroom, the Defendant fatally shot Arithio and Patricia and shot Pashea in her leg. The Defendant dragged Pashea to the living room where he fatally shot her. J.C. was heard screaming in the recording of the 9-1-1 call as Pashea was shot. The Defendant shot in an area where he believed A'Reco was lying and fled with J.C. We conclude that this evidence is sufficient to support the jury's finding of the (i)(3) aggravating circumstance for each first degree premeditated murder.

The jury also applied the "mass murder" aggravating circumstance to each first degree premeditated murder. *See* T.C.A. § 39-13-204(i)(12). The term "mass murder" is defined as "the murder of three (3) or more persons, whether committed during a single criminal episode or at different times within a forty-eight-month period." *Id.* The application of this aggravating circumstance requires proof that "the defendant has been *convicted* of three or more murders in Tennessee within a period of forty-eight (48) months prior to the sentencing hearing at which the murders are used to establish the aggravating circumstance." *Dotson*, 450 S.W.3d at 79 (emphasis in original). During opening statements in the penalty phase, trial counsel conceded that this aggravating circumstance applied. Prior to the penalty phase, the Defendant had been convicted of murdering three people during the same criminal episode. This proof is sufficient to support application of the mass murder aggravating circumstance to each first degree premeditated murder.

### 3. Weighing Aggravating and Mitigating Circumstances

We next consider whether the evidence supports the jury's finding that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. We must determine "whether a rational trier of fact could find that the

aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt when the evidence is taken in the light most favorable to the State." *State v. Freeland*, 451 S.W.3d 791, 820 (Tenn. 2014). The trial court instructed the jury regarding the following mitigating circumstances: (1) the Defendant's lack of a significant history of prior criminal activity; (2) evidence suggesting that the murder was "out of character" for the Defendant; (3) evidence of "provocation or self-protection"; (4) the relationship between the victims and the Defendant; (5) the Defendant's cooperation with authorities and his actions in surrendering to the police; (6) the Defendant's role as a "loving son and a loving family member"; (7) the Defendant's role as a "loving father" who provides "love and support to his children"; (8) the loss of the Defendant's stepfather, who was a "father figure" in the Defendant's life; (9) the impact of the Defendant's death on his family; (10) any statements of remorse by the Defendant; and (11) any other mitigating factor raised by the evidence.

The Defendant presented mitigation evidence during the penalty phase from his former defense counsel, two of his sisters, and his former girlfriend. The testimony from these witnesses established that the Defendant had three sisters, one brother, and two daughters, that the Defendant's father was incarcerated during the Defendant's childhood, that the Defendant's stepfather, with whom the Defendant was close, died after complications from three aneurysms and while the Defendant was comforting him, that he maintained a close relationship with his daughter, Y.C., while he was incarcerated, that the Defendant's family was close and still loved him, and that the Defendant and his counsel sought an agreement with the State whereby the Defendant would plead guilty to the first degree murders in exchange for consecutive sentences of life without parole but that the State rejected the proposed plea agreement.

The evidence presented to support the jury's finding of two aggravating circumstances for each conviction of first degree premeditated murder was overwhelming. In light of the overwhelming evidence to support the two aggravating circumstances, the jury found that these aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. Upon reviewing the statutory mitigating circumstances and the mitigation evidence presented, we conclude that viewing the evidence in the light most favorable to the State, a rational trier of fact could have found that the (i)(3) and (i)(12) aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

### 4. Proportionality Review

When this court conducts the proportionality review required by Tennessee Code Annotated section 39-13-206(c)(1)(D), we do not function as a "super jury" that substitutes our judgment for the judgment of the sentencing jury. *See State v. Godsey*, 60

S.W.3d 759, 782 (Tenn. 2001). Rather, we must take a broader perspective than the jurors to determine whether the defendant's sentences are "disproportionate to the sentences imposed for similar crimes and similar defendants." *State v. Thacker*, 164 S.W.3d 208, 232 (Tenn. 2005) (quoting *Bland*, 958 S.W.2d at 664). The pool of cases upon which we draw in conducting this analysis are "first degree murder cases in which the State sought the death penalty, a capital sentencing hearing was held, and the jury determined whether the sentence should be life imprisonment, life imprisonment without possibility of parole, or death." *State v. Rice*, 184 S.W.3d 646, 679 (Tenn. 2006).

The purpose of our review of other capital cases is not to identify cases that correspond precisely with the particulars of the case being analyzed. *State v. Copeland*, 226 S.W.3d 287, 306 (Tenn. 2007). Rather, our task is to "identify and invalidate the aberrant death sentence." *Thacker*, 164 S.W.3d at 233. A sentence is not disproportionate because other defendants have received a life sentence under similar circumstances. *State v. Carruthers*, 35 S.W.3d 516, 569 (Tenn. 2000). A death sentence is excessive or disproportionate where "the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." *Thacker*, 164 S.W.3d at 233 (quoting *Bland*, 958 S.W.2d at 668).

This court uses "the precedent-seeking method of comparative proportionality review, in which we compare a case with cases involving similar defendants and similar crimes." *Copeland*, 226 S.W.3d at 305 (quoting *State v. Davis*, 141 S.W.3d 600, 619-20 (Tenn. 2004)). We examine "the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating circumstances involved, and we compare this case with other cases in which the defendants were convicted of the same or similar crimes." *State v. Stevens*, 78 S.W.3d 817, 842 (Tenn. 2002).

In conducting this comparison with regard to the nature of the crime, we generally consider

> (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims.

*State v. Rimmer*, 250 S.W.3d 12, 35 (Tenn. 2008); *see Rollins*, 188 S.W.3d at 575. We also compare the defendant's "(1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation." *Rimmer*, 250 S.W.3d at 35; *Rollins*, 188 S.W.3d at 575.

The Defendant asserts that the comparative proportionality review adopted in *State v. Bland*, 958 S.W.2d 651 (Tenn. 1997), is unconstitutionally flawed. He seeks to modify proportionality review to broaden the pool of cases to be considered. The Tennessee Supreme Court recently rejected this claim and affirmed the comparative proportionality review adopted in *Bland*. *See Pruitt*, 415 S.W.3d at 217.

The evidence in the present case established that after the Defendant and Pashea argued, Pashea retreated to her parents' bedroom and closed the door. The Defendant rammed the door and fired his gun at the door in an effort to get to Pashea inside the bedroom. The Defendant continued shooting once inside the bedroom. He shot Arithio and Patricia multiple times and shot Pashea in the leg. The Defendant grabbed Pashea and dragged her down the hallway to the front of the house while J.C. screamed. Pashea attempted to get away. The Defendant told her that he was going to shoot her and then shot her in the head at close range. The Defendant shot into the couch where he believed A'Reco was sleeping. The Defendant then fled the scene with J.C. in Pashea's vehicle.

The Defendant was the youngest of five siblings. When he was a child, his father was imprisoned for a rape conviction. The Defendant had a close relationship with his stepfather, who died while the Defendant was comforting him. The Defendant had two daughters and continued to maintain a close relationship with Y.C. following his arrest. The Defendant offered to enter a guilty plea to the charges in exchange for consecutive sentences of life imprisonment without parole. The Shelby County District Attorney General rejected the offer.

We conclude that the death sentences in this case are not excessive or disproportionate when compared to the death penalty imposed in similar cases. The sentence of death has been upheld in numerous cases in which the defendant committed mass murder. *See, e.g.*, *Dotson*, 450 S.W.3d at 1 (defendant shot and killed his brother and three other adults and stabbed, beat, and killed his two nephews; multiple aggravators including mass murder and great risk of death of two or more persons); *State v. Jordan*, 325 S.W.3d 1 (Tenn. 2010) (defendant shot and killed his estranged wife and two men at his wife's place of employment; risk of death to two or more persons, felony murder, and mass murder aggravators to the two men, same three aggravators and heinous, atrocious, or cruel, and mutilation of body aggravators as to wife); *State v. Holton*, 126 S.W.3d 845 (Tenn. 2004) (defendant shot and killed his four children; mass murder and, as to three victims, under-twelve-years-old aggravators); *Carruthers*, 35 S.W.3d at 516 (defendants shot two men, strangled the mother of one of the men, and buried all three victims alive; prior violent felony, heinous, atrocious, or cruel, felony murder, and mass murder aggravators); *State v. Smith*, 868 S.W.2d 561 (Tenn. 1993) (defendant shot and stabbed

his wife and two stepsons; heinous, atrocious, or cruel, murder to avoid apprehension, felony murder, and mass murder aggravators).

Our supreme court has upheld the death sentence in numerous cases involving the defendant's murder of his wife or girlfriend. *See, e.g.*, *State v. Ivy*, 188 S.W.3d 132 (Tenn. 2006) (defendant shot estranged girlfriend multiple times; prior violent felony and murder to avoid apprehension aggravating circumstances); *State v. Faulkner*, 154 S.W.3d 48 (Tenn. 2005) (defendant struck wife repeatedly in head with iron skillet; prior violent felony aggravator); *State v. Suttles*, 30 S.W.3d 252 (Tenn. 2000) (defendant stabbed girlfriend; prior violent felony and heinous, atrocious, or cruel aggravating circumstances); *State v. Keough*, 18 S.W.3d 175 (Tenn. 2000) (defendant stabbed wife after argument in bar and left her to bleed to death in car; prior violent felony aggravator); *State v. Hall*, 8 S.W.3d 593 (Tenn. 1999) (defendant beat, strangled, and drowned his wife following an argument; heinous, atrocious, or cruel aggravator); *State v. Hall*, 958 S.W.2d 679 (Tenn. 1997) (defendant set fire to his girlfriend's car while she was inside after she had ended the relationship; heinous, atrocious, or cruel and felony murder aggravators); *State v. Johnson*, 743 S.W.2d 154 (Tenn. 1987) (defendant suffocated wife with plastic bag; prior violent felony and heinous, atrocious, or cruel aggravators).

In completing our review, we need not conclude that this case is identical to prior cases in every respect, nor must this court determine that this case is "more or less" like other death penalty cases. *Thomas*, 158 S.W.3d at 383. Rather, this court need only identify aberrant death sentences by analyzing whether a capital case plainly lacks circumstances similar to those cases in the pool of cases in which a death sentence has been upheld. The penalties imposed by the jury in the present case are not disproportionate to the penalty imposed for similar crimes.

## X.  Judgments for Non-Capital Offenses

During the sentencing hearing on the non-capital convictions, the parties announced that they reached an agreement. The prosecutor described the agreement as follows:

> Your Honor, in 12-02160, count four, criminal attempted murder first, the State is recommending and agreeing with the Defense as to that, as a standard range one offender fifteen years at the Tennessee Department of Correction[ ].
>
> In count number five, possession of a firearm the recommendation is three years at the Tennessee Department of Correction[ ], it is at one-

hundred (100%) percent and will be consecutive [to] count[s] one, two, three [the three convictions of first degree premeditated murder] and seven [unauthorized use of a motor vehicle].

In count number six of the indictment, Your Honor, the recommendation of both parties to employing a firearm during a dangerous felony is again a six year sentence at one-hundred (100%) percent. It is to be consecutive with counts one, two, three and seven, however concurrent with count five.

And the remaining count seven, unauthorized use of a motor vehicle, the lesser included offense, recommendation agreement between the parties is eleven months and twenty nine days. It will be concurrent with everything but counts five and six, the firearms.

The trial court accepted the sentences agreed upon by the parties.

The judgments, however, do not correctly reflect the concurrent or consecutive nature of the sentences announced by the State and approved by the trial court.[6] The judgment for the conviction of attempt to commit first degree murder in count four of the indictment provides that the fifteen-year sentence shall be served concurrently with counts one, two, three, and seven and consecutively to counts five and six. The "Special Conditions" portion of the judgment reflects that the fifteen-year sentence shall be served concurrently with counts one, two, three, and six and consecutively to count five. The judgment for the conviction of possession of a firearm with the intent to go armed during the commission of a dangerous felony in count five of the indictment provides that the three-year sentence shall be served concurrently with counts one, two, three, six, and seven and consecutively to count four. The judgment for the conviction of employing a firearm during the commission of a dangerous felony in count six provides that the six-year sentence shall be served concurrently with counts one, two, three, and seven and consecutively to count four. The judgment for the unauthorized use of a motor vehicle conviction in count seven provides that the eleven-month, twenty-nine-day sentence shall be served concurrently with counts one, two, three, four, and seven and consecutively to count five.

---

[6] In announcing that an agreement had been reached, trial counsel said, "We've got paperwork ready today." The "paperwork" was not described during the sentencing hearing. Following oral arguments in this case, this court entered an order requiring that the appellate record be supplemented with any orders relating to the sentencing of the non-capital convictions. The trial court clerk subsequently sent a notice to the clerk of this court that no such orders were located in the case jackets.

Because the trial court should have merged the possession of a firearm with the intent to go armed during the commission of a dangerous felony in count five with the employing a firearm during the commission or attempt to commit a dangerous felony convictions in count six, we remand for the entry of corrected judgments reflecting merger. The judgments also must be corrected to reflect accurately the sentences for the non-capital offenses agreed upon by the parties.

## CONCLUSION

After review of the record and the applicable law, we affirm the Defendant's convictions and death sentences. We conclude that the trial court should have merged the possession of a firearm with the intent to go armed during the commission of a dangerous felony conviction with the employing a firearm during the commission or attempt to commit a dangerous felony conviction. Pursuant to Tennessee Code Annotated section 39-17-1324(e)(1), the merged conviction must be served consecutively to the attempted first degree murder conviction in count four, which should be reflected in the corrected judgments. We remand for entry of corrected judgments reflecting merger and the sentences for the non-capital offenses as agreed upon by the parties.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

- 55 -